UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARLOW WHITE,                                      :     ECF Case
                                                   :
                       Plaintiff,                  :     Case No.: 15-cv-6696 (GHW/jlc)
                                                   :
            -against-                              :
                                                   :
THE CITY OF NEW YORK, NAPOLEON                     :     **AMENDED COMPLAINT**
MONROE, NYPD OFFICER UREIBA,                       :
OFFICER GARCIA, LIEUTENANT CAUTTER,                :
OFFICER ROSENDARY-PHILLIPS, OFFICER               :
ABRUE, DETECTIVE THOMAS, DETECTIVE                 :     **PLAINTIFF DEMANDS**
VRLIC, AND OFFICERS DOE1-3,                         :     **TRIAL BY JURY**
                                                   :
                       Defendants.                 :
                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff, Marlow White ("Plaintiff"), allege as his Amended Complaint the following:

1.      Plaintiff is a man of trans experience.  Plaintiff was the victim of numerous hate crimes, chosen as a victim because of his gender identity.  When the New York City Police Department ("NYPD") was called to the scene of the first attack on Plaintiff's family by defendant Napoleon Monroe ("Assailant"), the responding officers witnessed Assailant's criminal behavior.  The NYPD's officers refused to restrain or arrest Assailant and refused to take Plaintiff's criminal complaint against Assailant.  To the contrary, the NYPD's officers joked with Assailant and indicated to witnesses, within earshot of Plaintiff and Assailant, that they preferred to return to clean up the mess after Assailant had murdered Plaintiff.

2.      It took two weeks, repeated requests, and the threat of contempt of a state-court order before the NYPD reluctantly accepted and filed a criminal complaint from Plaintiff.  The NYPD, however, refused to arrest Assailant for any crimes against Plaintiff, even though Assailant was at that time and for a week thereafter in the NYPD's custody on other charges, thereby preventing Plaintiff even from obtaining a protective order.  Assailant resumed his

campaign of hate crimes against Plaintiff but the NYPD did not respond to Plaintiff's 911 calls, much less attempt to arrest Assailant.

3. Plaintiff lived in constant fear for the safety and well being of himself, his partner and their four young daughters. Plaintiff's physical and mental health deteriorated and his relationships suffered as a result of the sleeplessness, depression, isolation, and chronic anxiety that came with knowing that Assailant could come at any time to torture, rape, kill, or otherwise terrorize Plaintiff and his family; knowing that Plaintiff, unlike every other New Yorker, would have no one to call for help; and knowing that Assailant knew it.

4. Separate from the damages caused by Assailant, the NYPD's abuse of Plaintiff inflicted a distinct, deeper harm all its own. To be publicly violated in such a deliberate manner by the NYPD, or the agents of their choosing, acting with impunity demonstrates to the victim's entire community that the victim is beneath the law, beneath civility, a plaything to be harmed or broken with impunity, less than human. It erodes one's dignity in a way that no physical attack alone could and inflicts damages orders of magnitude beyond mere physical injury.

5. The NYPD refuses to see Plaintiff and his family as persons entitled to the protection of law. The NYPD refuses to see Plaintiff as a citizen entitled to human, civil and constitutional rights. The NYPD refuses to see Plaintiff as a human being. All because the NYPD doesn't want to see Plaintiff as a man.

6. Defendants' conduct attacks the foundation of our civilized society as a free people ruled by law and dishonors the officers who have served with honor and distinction. If the NYPD can do this to Plaintiff, it can do it to any other family based upon how they look, live, love, believe or pray.

7.      Accordingly, Plaintiff seeks injunctive relief and compensatory and punitive damages, pursuant to 42 U.S.C. § 1983 for violations Plaintiff's equal protection and due process rights, and pursuant to the New York Civil Rights Law and New York City Human Rights Law.

## BACKGROUND AND TERMINOLOGY

8.      This case concerns the constitutional and legal protections afforded to people who are selected for discrimination because they do not conform to society's norms and expectations relating to gender.  Before considering the relevant facts in detail, it is helpful to explain some of the relevant terminology and to consider the nature and cultural significance of sex, gender, gender identity, and gender expression.

9.      A person's "sex" refers to biological characteristics of the physical human body that are independent of social or political context.  The vast majority of persons either possess one X and one Y chromosome and are born as a male or posses two X chromosomes and are born female.

10.      A person's "gender," on the other hand, has only a tenuous connection to biology and is almost entirely a social construct of what it means to be masculine or feminine, to act like a man or act like a woman.  "Gender identity" is a person's sense of being a male, female or somewhere in-between.  "Gender expression" describes the outward physical characteristics and behaviors that one's culture defines as belonging to a male or female, for example dress, mannerisms, speech patterns and social interactions.

11.      A person whose gender identity and gender expression comport with their society's gender norms for their sex are referred to as "cis-gendered."  A significant number of people, however, are gender non-conforming, for example because they are masculine women or feminine men or because they wish to love and partner with a person of the same sex.  A "person

of trans experience" has a gender identity and gender expression that non-conforms so profoundly that it corresponds to their society's gender norms for the other sex. A person of trans experience who openly manifests their true gender identity is said to "transition" from one gender to the other in a process can involve counseling, hormone therapy, surgery and other social and physical processes. Once a person of trans experience transitions, if their outward appearance objectively comports with their identified sex they are often referred to as "passable."

12.     Like all social constructs, the concept of gender varies widely between cultural contexts and over time. The construct of gender, however, almost uniformly mirrors the binary classification applied to sex. In other words, although different cultures at different times have ascribed varying characteristics to men and women, the very notion of gender presupposes that all people naturally and obviously manifest one of two mutually exclusive, neatly arranged sets of behaviors and physical attributes that exactly correspond to their biological sex.

13.     The idea that sex and gender are dichotomies is so deeply ingrained in our thinking that it is presumed without conscious thought as immutable, but it is an entirely false dichotomy. Even the notion of sex as binary is contrary to fact and without scientific basis. The fact is that sex is like every other biological phenomenon and exists not as two mutually exclusive categories but rather as a continuum of physiological features. Experience teaches that no two bodies are identical. Indeed, the foundational observation of Darwin's theory of evolution is that on the population level individuals of a species vary in virtually every respect.

14.     Consistent with the fact of biological diversity within the human species, a small but significant number of people are born as intersex, meaning they have genetic material, genitalia, internal sex organs and/or secondary sexual characteristics that are typically found in both, or sometimes neither, males and females. Contrary to the unchallenged notion that sex is a

dichotomy, "any close study of sexual anatomy results in a loss of faith that there is a simple, 'natural' sex distinction that will not break down in the face of certain anatomical, behavioral, or philosophical challenges."[1] Understanding that the entire notion of a binary classification of sex is a myth illuminates the obvious folly of reducing the entire biological and physiological complexity of the human existence into one of two mutually exclusive categories.

15.     Considering the totality of the differences between the social expectations for men and women in child rearing, family, worship, art, sex, education, politics and every other area of human endeavor, compelling a person to conform to their society's gender norms can severely restrict a person's fundamental freedoms. Such compulsion to gender conform is profoundly unjust and utterly irrational, because a person's conformance to gender norms bears no rational relationship to their ability to perform in or contribute to society and because such compulsion prevents a person from realizing their inner core of highest human potential.

16.     Nevertheless, wherever and whenever gender non-conformance is manifest, it calls down invidious discrimination. Unfortunately, there is a long history of such discrimination and violence against persons of trans experience in particular. The numbers are staggering. According to the National Coalition of Anti-Violence Programs, 72% of anti-LGBTQ homicide victims are women of trans experience and 67% are trans women of color. According to that same source, persons of trans experience are 300% more likely to be the victims of police violence, and trans persons of color are twice as likely to be victimized by police violence than their white counterparts.

17.     Because persons of trans experience do not have the strength to politically protect themselves from wrongful discrimination, they continue to face legal, social and political

---

[1] Chinyere Ezie, Deconstructing the Body: Transgender and Intersex Identities and Sex Discrimination—The Need for Strict Scrutiny, 20 COLUM. J. GENDER & L. 141, 155 (2011).

obstacles to the free expression of their true identities, not to mention threats to their very lives and well being.  Sadly, that plight is illustrated by the facts of this case.

## THE PARTIES

18.      Marlow White is a natural person who resides and is domiciled in the State, County and City of New York.  Plaintiff is a devoted father and community activist who advocates for other people, especially young people, of all ages, genders and experiences.  He is also a man of trans experience and a man of color.

19.      As a person of trans experience, Plaintiff is a member of a quasi-suspect class and any infringement on his rights or liberties must be substantially related to an important government interest, i.e., intermediate scrutiny.  Further, because discrimination against persons of trans experience is based upon their failure to comport with social expectations grounded entirely upon physical sex characteristics, it is a species of sex-based discrimination that also requires intermediate scrutiny.

20.      Defendant The City of New York ("City") is a municipal corporation duly organized and existing under the laws of the State of New York.  The City can be served with process care of Corporation Counsel, 100 Church Street, New York, New York.

21.      As set forth below in greater detail, the acts and omissions complained of were perpetrated by the NYPD, the agency of the City of New York responsible for law enforcement, and certain of the NYPD's officers acting further to and consistent with the official custom or policy of the City.  Pursuant to the New York City Charter, however, all actions or proceedings for the violation of any law must be brought in the name of the City of New York, not its agencies.  The NYPD therefore is not a party to this action.

22.     Defendant Officer Ureiba is employed by the City as an NYPD officer.  The full name, rank and true identity of Officer Ureiba is unknown to Plaintiff without discovery, however Officer Ureiba is the officer who was dispatched from the 28th Precinct to Plaintiff's residence at or about 8:30 a.m. on May 6, 2015 with Officer Garcia.  Officer Ureiba is also the officer who refused to take a criminal complaint from Plaintiff on the afternoon of May 6, 2015 at the NYPD's 28th Precinct.

23.     Defendant Officer Garcia is employed by the City as an NYPD officer.  The full name, rank and true identity of Officer Garcia is unknown to Plaintiff without discovery, however Officer Garcia is the officer who was dispatched from the 28th Precinct to Plaintiff's residence at or about 8:30 a.m. on May 6, 2015 with Officer Ureiba.

24.     Defendant Lieutenant Cautter is employed by the City as an NYPD Lieutenant. The full name, rank and true identity of Lieutenant Cautter is unknown to Plaintiff without discovery, however Lieutenant Cautter is the officer who was identified as the officer in command at the NYPD's 28th Precinct on the afternoons of May 6, 2015 and May 17, 2015, at or about noon.

25.     Defendant Officer Rosendary-Phillips is employed by the City as an NYPD officer.  The full name, rank and true identity of Officer Rosendary-Phillips is unknown to Plaintiff without discovery, however Officer Rosendary-Phillips was the officer on duty at the NYPD's 28th Precinct on the afternoon of May 17, 2015, at or about 12:00 noon, who was directed by Lieutenant Cautter to interview Plaintiff and his counsel.

26.     Defendant Officer Abrue is employed by the City as an NYPD Integrity Officer. The full name, rank and true identity of Officer Abrue is unknown to Plaintiff without discovery, however Officer Abrue was the officer on duty at the NYPD's 28th Precinct on the afternoon of

May 17, 2015, at or about noon, who was consulted in connection with the NYPD's further refusal to take a criminal complaint from Plaintiff.

27. Defendant Detective Thomas is employed by the City as a detective. The full name, rank and true identity of Officer Thomas is unknown to Plaintiff without discovery, however Officer Thomas was the detective who was assigned responsibility for Plaintiff's complaint against Assailant.

28. Defendant Detective Vrlic is employed by the City as a detective assigned to the hate crimes unit. The full name, rank and true identity of Detective Vrlic is unknown to Plaintiff without discovery, however Detective Vrlic and his partner, Officer Doe2, were the detectives who were assigned responsibility for Plaintiff's complaint against Assailant.

29. Defendants NYPD Officers Doe1-3, being fictitious names, are each employed by the City as an NYPD officer. The full names, ranks and true identities of Officers Doe1-3 are unknown to Plaintiff without discovery but information sufficient to identify them to defendant City is set forth in this Amended Complaint.

30. The domiciles of Officer Ureiba, Officer Garcia, Lieutenant Cautter, Officer Rosendary-Phillips, Officer Abrue, Detective Thomas, Detective Vrlic, and Officers Doe1-3 (collectively, the "Officer Defendants") are unknown to Plaintiff without discovery. However, upon information and belief, all Officer Defendants are domiciled in the State of New York, as required by the New York State Public Officers Law, in either the City of New York or a surrounding county.

31. As set forth in greater detail below, the Officer Defendants' culpable conduct relates to their official duties of a uniformed police officer discharging the police powers held and exercised by the state. Those duties include to take and file complaints of criminal activity,

to take and file a report of any culpable act or omission by a police officer, to investigate criminal activity and make arrests where probable cause exists to do so, and to respond to emergency situations.  The Officer Defendants therefore acted under color of state law because they exercised power possessed by virtue of state law and made possible only because they were clothed with authority of state law.

32.     Defendant Napoleon Monroe ("Assailant") is a natural person domiciled and residing in the State, County and City of New York.

**JURISDICTION AND VENUE**

33.     This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiff's claims against the City and Officer Defendant arising under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendment to the Constitution of the United States.

34.     This Court has supplemental subject matter jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's claims arising under the laws of the State of New York and City of New York, because those state-law claims are so related to Plaintiff's original-jurisdiction federal claims that they form part of the same case or controversy under Article III of the Constitution of the United States.

35.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) in that all Defendants reside in the State of New York and at least one defendant is located in this district, and because the events giving rise to Plaintiff's claims occurred in this district.

## FACTS RELATING TO PLAINTIFF'S CLAIMS

**A.    Plaintiff was the victim of hate crimes perpetrated by Assailant,**
**who victimized Plaintiff solely because her is a person of trans experience.**

36.    Plaintiff first met Assailant in March 2015, when Assailant became the paramour of non-party Ms. Amezquita.  Ms. Amezquita lives in Plaintiff's building and both Plaintiff and Ms. Amezquita are officers on their building's cooperative corporation board of directors.

37.    Plaintiff has lived in his building for approximately twenty years and lived there while he transitioned.  He was instrumental in converting the building to a cooperative regime of governance as a Housing Development Fund Corporation and has served on its board, including a tenure as its president.

38.    On March 20, 2015, Plaintiff had occasion to deliver to Ms. Amezquita's apartment some documents relating to their shared responsibilities as officers of the cooperative's board.  When Ms. Amezquita answered and invited Plaintiff inside, she introduced him to Assailant.

39.    After some small talk, Assailant told Plaintiff that Assailant is uncomfortable in regards to Ms. Amezquita speaking to Plaintiff about "their business." Plaintiff listened and didn't interrupt Assailant.  Assailant then stood up and showed Plaintiff his stab wounds and added how Assailant had been shot numerous times and lived the street life and how he knows Plaintiff thinks he is a thug, all in an attempt to intimidate Plaintiff.

40.    There are other members of the coop board who are cis-gendered men who regularly interact with Ms. Amezquita in connection with board business.  There also are other cis-gendered men who live in their apartment building who regularly interact with Ms. Amezquita.  Assailant never approached any of them with an admonition to stay away from Ms. Amezquita, or with any other complaint or affront.

41.    Plaintiff told Assailant that there was nothing to be concerned about. Assailant shouted at Plaintiff, "I don't want to hear that shit! Because I'm a real man with a <u>real</u> dick!"

42.    Understanding that Assailant's discomfort and hostility related to the nature of his trans experience, Plaintiff responded, "Ohhh! Now I see where this is going, you're insecure about your manhood and trying to make that about me. Not happening!  I don't know what [Ms. Amezquita] told you but do me a favor, the two of you keep me out of your relationship!" Plaintiff also asked Assailant not to speak to him anymore.

43.    As Plaintiff was walking out of the apartment, Assailant shouted, "don't you come back here no more!"

44.    Thereafter, when Plaintiff and Assailant would see each other in or around Plaintiff's apartment building, Assailant made a point to stop and say hello to Plaintiff as if nothing happened.  During each such encounter Plaintiff ignored Assailant.  With each passing encounter Assailant grew more agitated.

45.    On May 3, 2015, Plaintiff then began to receive on his cell phone threatening text messages from a cell phone that he knew to belong to Ms. Amezquita.  At the time, Plaintiff was driving with three of his daughters.

46.    Plaintiff's oldest daughter looked at Plaintiff's phone, which contained numerous text messages sent from Ms. Amezquita's cellular telephone by Assailant.  Plaintiff's daughter exclaimed, "Oh my God! It says something about cutting off your head!"

47.    The text messages from Assailant contained numerous threats to Plaintiff's life and the safety of Plaintiff and his family.

48.    For example, Assailant wrote to Plaintiff, "I'm going to speak to your wife and see if she needs my company when you and her go threw [sic] things.  Ill [sic] talk to her and

treat her way better than [Ms. Amezquita]." Plaintiff understood that to be a reference to the physical abuse Assailant had inflicted upon Ms. Amezquita and a threat to inflict similar abuse upon Plaintiff's partner.

49.     Assailant also wrote to Plaintiff "let's play motherfucker!" and "I'll cut your fucking head off lil man," which Plaintiff understood to be a threat to his life.

50.     Assailant engaged in that threatening conduct with the intention of harassing and intimidating Plaintiff and place him in fear of serious physical harm to himself and his family.

51.     Plaintiff was deeply disturbed, intimidated and threatened by Assailant's increasingly aggressive behavior. Plaintiff made sure to point Assailant out to his minor daughters. Because of Assailant, Plaintiff's family made a safety plan that included frequent communication with Plaintiff's children whenever they left or arrived at a location and other safety measures adopted in anticipation of a physical attack from Assailant.

52.     There are other members of the coop board who are cis-gendered men who regularly interact with Ms. Amezquita in connection with board business. There also are other cis-gendered men who live in their apartment building who regularly interact with Ms. Amezquita. Assailant never threatened or intimidated any of those men, only Plaintiff.

53.     Plaintiff requested an emergency meeting with his apartment building's cooperative corporation's board of directors and its shareholders to address Assailant's threats. That meeting took place on May 5, 2015 and the shareholders decided to change the building's locks to provide its residents with some measure of security against Assailant.

54.     Ms. Amezquita told Assailant about that emergency board meeting.

55.     On the morning of May 6, 2015, Assailant lay in wait outside of Plaintiff's apartment building.

56.     At approximately 8:15 am, Plaintiff's partner was leaving their home for work. Assailant was waiting outside and as she stepped onto the sidewalk Assailant stopped her and asked if she was Plaintiff's wife.

57.     She replied, "do not ask me any questions because I don't know you. Leave me alone!"

58.     Among other threats, Assailant shouted to Plaintiff's partner, "I'm going to fuck you up" and "I'm going to fuck your transsexual husband up."  Assailant is at least a foot taller than Plaintiff's partner.

59.     Assailant selected Plaintiff's partner as a victim because of her relationship with Plaintiff, in a continued effort to harass and intimidate Plaintiff and place him in fear of serious harm.

60.     Plaintiff's partner then went back inside the apartment building and began to bang on Ms. Amezquita's door, telling her to come get Assailant, but she refused to do so.

61.     Meanwhile, Assailant had followed Plaintiff's partner into the building and continued his assault with verbal threats, physical intimidation, obscenities and lewd conduct.

62.     Plaintiff was in his apartment at the time with two of his daughters, including his three year old, when Plaintiff heard the intercom bell ringing in a way that was urgent.  Plaintiff hit the intercom buzzer and asked who was there but all he could hear was his partner arguing and yelling "leave me alone, leave me alone" at Assailant.

63.     Plaintiff went downstairs immediately, where neighbors had begun to gather.

64.     Assailant's conduct was so threatening and disturbing that one of Plaintiff's neighbors came out of his apartment with a baseball bat.

65.     During this time, Assailant was loudly and repeatedly asking Plaintiff's partner if she wanted to see Assailant's penis and shouting "transsexual" at Plaintiff.

66.     Several people called 911 and the NYPD dispatched Officers Ureiba and Garcia.

**B.      The NYPD refused to render assistance to Plaintiff, or even to take Plaintiff's criminal complaint against Assailant, despite the overwhelming physical evidence of Assailant's criminal conduct.**

67.     When the Officers Ureiba and Garcia arrived at Plaintiff's apartment building, they initially came to speak to Plaintiff and his partner.  When Assailant began to approach, the officers directed Assailant to step back.

68.     As Plaintiff's partner was explaining what had happened, she mentioned the fact that Plaintiff had been selected as a victim by Assailant because Plaintiff is a man of trans experience.

69.     As soon as Officers Ureiba and Garcia learned that Plaintiff is a man of trans experience, they expressed obvious distaste for Plaintiff, their entire demeanor changed and they became completely uncooperative.

70.     Officers Ureiba and Garcia refused to take a criminal complaint from Plaintiff or from his partner and refused even to look at Plaintiff's phone, which still contained the death threats sent by Assailant.

71.     Plaintiff's neighbors, also concerned about Plaintiff's well being and the disturbing nature of Assailant's behavior, also implored Officers Ureiba and Garcia to take a criminal complaint from Plaintiff and his partner.

72.     Meanwhile, as Plaintiff, his partner, and their neighbor witnesses continued trying to tell the facts to the Officers Ureiba and Garcia, Assailant was walking up and down the block

shouting "transsexual" while gesturing towards Plaintiff, all within sight and earshot of Officers Ureiba and Garcia.

73. The entire time, Assailant repeatedly reached into his pants to grab his penis while shouting at Plaintiff's partner asking if she wanted to see his penis and that Assailant was a "real man with a real dick," all within sight and earshot of Officers Ureiba and Garcia.

74. Within sight and earshot of Officers Ureiba and Garcia, Assailant purported to loudly place a telephone call to a "grandmaster" to request that grandmaster "take care of this transsexual and these people." Plaintiff understood that to be a threat of serious bodily harm to himself and his family.

75. At one point, Assailant went into Ms. Amezquita's apartment and came out wearing an apron as a prop in his taunting and mocking of Plaintiff. Assailant did so in the presence of Officers Ureiba and Garcia, who did nothing but smirk.

76. At another point, Assailant shouted at Officers Ureiba and Garcia, "officer you know me, I'm Napoleon" to which Officer Garcia turned around and smiled at Assailant.

77. One witness asked the Officers Ureiba and Garcia, "so you guys are going to stand here and not take a report from anyone?" Officer Ureiba responded and said, "he [Assailant] just said the same thing" and that they would wait until someone is dead then come pick up the pieces.

78. It is noteworthy that the NYPD Patrol Guide imposes a non-discretionary duty to make and file all criminal complaints, defined as "an allegation of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred." NYPG Patrol Guide, Procedure No: 207-01. Further, NYPD officers have a nondiscretionary duty to report all allegations of misconduct against uniformed members of the

service, including an allegation that an officer failed to take and file a complaint. *See, e.g.,* NYPG Patrol Guide, Procedure No: 207-31.

79.     Although officers have discretion in investigating complaints, all complaints "shall: be recorded because, "[p]roper complaint reporting is essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting. Every member of the service involved in this process has a responsibility and obligation to ensure the integrity of this vital, strategic resource."  NYPD Patrol Guide, Procedure No: 207-01.

80.     Proper reporting of criminal complaints is especially vital in the context of discrimination based upon gender expression, crimes which are both pervasive and under reported.  Indeed, there is a compelling government interest to report and investigate such hate crimes.  For example, New York Penal Law specifically provide, in relevant part, that:

> The intolerable truth is that in these crimes, commonly and justly referred to as "hate crimes", victims are intentionally selected, in whole or in part, because of their race, color, national origin, ancestry, gender, religion, religious practice, age, disability or sexual orientation. **Hate crimes** do more than threaten the safety and welfare of all citizens. They **inflict on victims incalculable physical and emotional damage and tear at the very fabric of free society.** Crimes motivated by invidious hatred toward particular groups not only harm individual victims but send a powerful message of intolerance and discrimination to all members of the group to which the victim belongs. **Hate crimes can and do intimidate and disrupt entire communities and vitiate the civility that is essential to healthy democratic processes**. . .

N.Y. Penal Law § 485.00 ("Hate Crime Law") (emphasis added).

81.     As a further example of the compelling government interest in curtailing crimes based upon gender identity, the City of New York in 2002 amended the Title 8 of the Administrative Code of the City of New York (the "New York City Human Rights Law") to

protect individuals from discrimination based on their gender and gender identity, including the finding that, "bias-related violence or harassment and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the institutions and foundation of a free democratic state." New York City Human Rights Law § 8-101.

82.    The New York State Assembly, in enacting the analogous New York Executive Law § 290 *et seq*. (the "New York State Human Rights Law"), also found and declared that bias crimes, including those motivated by expressions of gender identity, "menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants." New York State Human Rights Law § 290.

83.    It is equally noteworthy that the New York Penal Law § 485.05 provides for a separate offense and additional penalties where a person commits a specified offense and selects either the criminal act or its victim in whole or in substantial part because of a belief or perception regarding a person's expression of their gender identity.

84.    The specified offenses include the following provisions of the N.Y. Penal Law, all of which describe Assailant's conduct that has victimized Plaintiff and his family:  § 240.25 harassment in the first degree; § 240.30 aggravated harassment in the second degree;  § 120.45 stalking in the fourth degree; § 120.50 stalking in the third degree; § 120.14 menacing in the second degree; and § 120.15 menacing in the third degree.  Further, Assailant clearly selected Plaintiff in whole or substantial party because Plaintiff is a person of trans experience.

85.    Officers Ureiba and Garcia nevertheless repeatedly refused to take any criminal complaint from Plaintiff against Assailant based upon the criminal conduct alleged by Plaintiff.

86.     Officers Ureiba and Garcia also repeatedly refused to take any criminal complaint from Plaintiff against Assailant based upon the criminal conduct the officers personally witnessed.

87.     Officer Ureiba refused even to look at Assailant's threatening text messages contained on Plaintiff's cell phone.

88.     Assailant then walked up to Plaintiff's partner and loudly asked if she wanted to see his "real dick," which he proceeded to begin to remove from his pants.  Plaintiff's partner again appealed to Officer Garcia, who was standing next to her, "you see what I mean, are you going to just let him do this?"

89.     At that point, Officer Garcia said, "all right," directed Assailant to step back and took a criminal complaint from Plaintiff's partner's against Assailant.  Officers Ureiba and Garcia, however, did not arrest Assailant in connection with that complaint and, despite having witnessed the conduct themselves, prevented any such arrest by immediately closing that complaint.

90.     Assailant was never arrested in connection for any conduct directed at Plaintiff's partner.

91.     As Officers Ureiba and Garcia were getting back into their car to leave the scene, Plaintiff approached them and again asked to show them the threatening text messages from Assailant.  Officer Ureiba aggressively shouted at Plaintiff, "Step back you, I don't know if you have a weapon on you or something."  Neither officer had expressed any such aggressive tone and demeanor or supposed concerns about safety towards Assailant.

92.     Meanwhile, Ms. Amezquita decided to approach Officers Ureiba and Garcia and inform them that she wished to file a criminal complaint against Assailant.  Officers Ureiba and

Garcia directed Ms. Amezquita to get into their vehicle. As Assailant came over, Officer Ureiba directed Assailant to move away.

93.     Officers Ureiba and Garcia drove off with Ms. Amezquita and took her to the NYPD's 28th Precinct, where they accepted from Ms. Amezquita a criminal complaint against Assailant. When Assailant arrived at the 28th Precinct an hour later, Assailant was arrested for the crime alleged by Ms. Amezquita.

94.     Plaintiff and his partner arrived at the 28th Precinct shortly thereafter , at or about noon on May 6, 2015, and asked Lieutenant Cautter, the officer then in command of the 28th Precinct, for assistance filing a criminal complaint against Assailant.

95.     Lieutenant Cautter was aware of Plaintiff, the nature of his complaint against Assailant and Officers Garcia and Ureiba's refusal to take and file that complaint without Plaintiff having to explain those details. Lieutenant Cautter treated Plaintiff with obvious disdain.

96.     Lieutenant Cautter directed Plaintiff to speak to Officer Ureiba, who was nearby processing Assailant's arrest for domestic violence in connection with Ms. Amezquita's complaint.

97.     As Officer Ureiba approached Plaintiff, Officer Ureiba told Plaintiff "if this is about those text messages I don't want to see them." Officer Ureiba repeatedly refused to take any criminal complaint from Plaintiff, even though Plaintiff explained that he was in fear for his safety and the safety of his family. Their entire conversation was held in view and earshot of both Lieutenant Cautter and Assailant.

98.     Neither Officer Ureiba, Lieutenant Cautter, nor any other NYPD officer would accept or take any criminal complaint from Plaintiff against Assailant based upon either the

criminal conduct alleged by Plaintiff, the criminal conduct witnessed by Officers Ureiba and Garcia, or the criminal conduct evidenced by the threatening text messages from Assailant to Plaintiff's cell phone.

99.    Further, Lieutenant Cautter was aware of Officer Ureiba's violation of Plaintiff's rights but ratified those violations rather than corrected them.

100.    After Plaintiff returned home, he received another text message from Ms. Amezquita's cell phone, this one reading "I am really sorry for all this situation. I don't have words to tell you how sorry I am that you get [sic] involved in this mess. I didn't want him . . ."

**C.    Plaintiff served the NYPD with a state court TRO but the NYPD yet again refused to take Plaintiff's criminal complaint against Assailant.**

101.    On May 13, 2015, Plaintiff obtained the assistance of counsel. The next day, Plaintiff's attorney gave twenty-four hours notice to the New York City Law Department, counsel for the City, that Plaintiff intended to apply to the Supreme Court of the State of New York, New York County, for a preliminary injunction and temporary restraining order directing the City to accept, file, and investigate Plaintiff's criminal complaint against Assailant. Plaintiff's counsel did not receive any response to that notice.

102.    On the morning of May 15, 2015, Plaintiff commenced a mandamus proceeding under Article 78 of the New York Civil Practice Law and Rules, captioned *Marlow White v The New York City Police Department et al.*, Index No. 100844/2015 (the "State Court Proceeding"),[2] seeking to compel the NYPD to accept and file Plaintiff's criminal complaint against Assailant and to assist Plaintiff in obtaining an order of protection.

---

[2] Plaintiff ultimately discontinued the State Court Proceeding by filing a Notice of Discontinuance Without Prejudice.

103.   Prior to the hearing of that application, Plaintiff's counsel again telephoned the New York City Law Department and left a message regarding the pending application to the state court.  That call was retuned by the NYPD's agency counsel, with whom Plaintiff's counsel had several telephone conversations about the facts alleged and relief sought.  The NYPD's agency counsel ultimately stated that the City did not intend to appear but would take and file Plaintiff's complaint against Assailant if Plaintiff appeared that afternoon at the 28th Precinct.  Plaintiff's counsel responded that he would inform the state court of their conversations and request injunctive relief, both of which he did.

104.   The state court granted Plaintiff's application and issued a temporary restraining order (the "TRO") directing the 28th Precinct's commanding officer then on duty to "prepare, accept and file a criminal complaint from [Plaintiff] against Napoleon Assailant and to assist and cooperate with [Plaintiff's] application for an order of protection against Mr. Assailant."

105.   Because of the late hour and child care obligations, however, Plaintiff was unable to travel to the 28th Precinct that day.

106.   On May 17, 2015, at or about 12:00 noon, Plaintiff's attorney personally served the TRO and supporting Verified Petition upon the officer then on duty at the NYPD's 28th precinct, Lieutenant Cautter, and requested that the NYPD take Plaintiff's criminal complaint against Assailant.

107.   The Verified Petition sets forth in detail Assailant's criminal conduct and included clear statements that Plaintiff was in fear for the safety and well being of himself and his family.

108.   While reading the TRO and supporting Verified Petition, Lieutenant Cautter was silent other than to exclaim "person of trans experience" in a mocking tone when he read the first

sentence of the Verified Petition, which document begins "Petitioner is a man of trans experience."

109.   Lieutenant Cautter initially instructed Officer Rosendary-Phillips to take Plaintiff's statement.

110.   Officer Rosendary-Phillips had a hostile attitude towards Plaintiff, advocating for Assailant and disregarding clearly established law and procedure.

111.   For example, Officer Rosendary-Phillips dismissed Plaintiff's allegations that Assailant had engaged in threatening conduct as "hearsay" and stated that Assailant's call to have "this transsexual" executed was not a crime because Assailant did not specifically identify Plaintiff by his first and last name and there is more than one transsexual living in Harlem.

112.   During Officer Rosendary-Phillips' interview of Plaintiff, Plaintiff's counsel repeatedly objected or otherwise took a position contrary to Officer Defendant Rosendary-Phillips' position.  On several occasions, Officer Rosendary-Phillips left the interview room to speak at length with Officers Cautter and Abrue about Plaintiff's counsel's objections and insistence.  Officers Cautter and Abrue declined to speak to Plaintiff or Plaintiff's attorney.

113.   Officer Rosendary-Phillips did read the threatening text messages from Assailant contained on Plaintiff's phone and even took the phone from the interview room to show them to Officers Cautter and Abrue.  Officers Rosendary-Phillips dismissed the threatening texts sent by Assailant because they were not sent from Assailant's phone and because Plaintiff first read one such text in New Jersey.

114.   Those threatening text messages fall squarely within the conduct described by New York Penal Law § 240.30 Aggravated harassment in the second degree, which provides in relevant part that "A person is guilty of aggravated harassment in the second degree when:

1. With intent to harass another person, the actor either: (a) communicates, anonymously or otherwise, by telephone, by computer . . . or delivering any other form of communication, a threat to cause physical harm to, or unlawful harm to the property of, such person, or a member of such person's same family . . . and the actor knows or reasonably should know that such communication will cause such person to reasonably fear harm to such person's physical safety or property, or to the physical safety or property of a member of such person's same family . . ."

115.    Officers Rosendary-Phillips, Cautter and Abrue nevertheless refused to take or file any criminal complaint from Plaintiff, despite the physical evidence presented and the TRO directing that Plaintiff's complaint be taken.

**D.    Although the NYPD reluctantly accepted Plaintiff's criminal complaint against Assailant, the NYPD continued to deny to Plaintiff the police protections otherwise available in the community.**

116.    The next morning, Plaintiff's counsel informed the NYPD's agency attorney that Plaintiff would seek to hold the NYPD liable for contempt of the TRO.

117.    Shortly thereafter, the NYPD agreed to send officers to accept Plaintiff's criminal complaint, which they did that evening at Plaintiff's apartment building.

118.    On the evening of May 18, 2015, pursuant to the arrangement made between Plaintiff's and the NYPD's counsel, three NYPD officers arrived at Plaintiff's apartment building to take Plaintiff's criminal complaint against Assailant.  Plaintiff's counsel was present.

119.    Those non-party officers, who included Deputy Inspector Obe, the commanding officer of the NYPD's 28th Precinct, were extraordinarily courteous to Plaintiff.

120.    Deputy Inspector Obe introduced herself and said, "I'm so sorry about this, Plaintiff.  This isn't the NYPD that I know."

121.     Deputy Inspector Obe assured Plaintiff that his complaint would be handled appropriately and his allegations taken seriously, gave Plaintiff her telephone number, and directed the other non-party officers to take a complaint from Plaintiff.

122.     Deputy Inspector Obe then left and Plaintiff gave the other non-party NYPD officers a complete statement of Assailant's conduct and the conduct of the Officer Defendants.

123.     The non-party NYPD officers, however, informed Plaintiff that they would prepare a criminal complaint against Assailant in connection only with the criminal conduct evidenced by a single threatening text message from Assailant to Plaintiff's cell phone.

124.     The criminal complaint made and filed by the NYPD does not reflect the totality of the criminal behavior alleged by Plaintiff and does not reflect any of the criminal behavior witnessed by Defendant Officers Ureiba and Garcia.

125.     Plaintiff specifically told the non-party NYPD officers that he wanted to obtain an order of protection against Assailant and requested their assistance, as directed in the TRO. The officers instructed Plaintiff to obtain a copy of his criminal complaint once it was processed by the NYPD and take a copy of the criminal complaint to the state criminal court to apply for a protective order.

126.     That night, detectives from the NYPD's Hate Crimes Unit showed up unannounced at Plaintiff's apartment and interviewed him about Assailant's conduct.

127.     On May 18, 2015, when the NYPD accepted Plaintiff's criminal complaint, Assailant was still in the NYPD's custody in connection with the crimes alleged by Ms. Amezquita, but the NYPD did not arrest Assailant for any crimes against Plaintiff.

128.     The identity of the NYPD officer(s) who made the decision not to arrest Assailant for crimes against Plaintiff while Assailant was already in NYPD custody is unknown but is identified herein as Defendant Officer Doe1.

129.     On or about May 19, 2015, Plaintiff and his partner went to the state criminal court to obtain an order of protection against Assailant but were refused.  Plaintiff was advised that such an order of protection cannot be issued unless the person complained of is arrested in connection with the victim's complaint.

130.     Thereafter, Detective Thomas became the lead detective charged with investigating Plaintiff's criminal complaint against Assailant.  Plaintiff told Detective Thomas that he wanted to apply for an order of protection, as set forth in the TRO, and that he could not obtain such an order of protection unless Assailant was arrested in connection with Plaintiff's complaint.

131.     Detective Thomas did not at any time arrest Assailant for any crime against Plaintiff.

132.     Approximately one week later, Detective Thomas allowed the NYPD to released Assailant from custody without arresting him for any crimes against Plaintiff.

133.     Detective Thomas thereafter called Plaintiff and told him, for the first time, that the NYPD could not arrest Assailant until Plaintiff identified him, notwithstanding the fact that Plaintiff had unambiguously identified Assailant to Officer Ureiba, Officer Garcia, and Lieutenant Cautter while Assailant was standing right in front of them.  Plaintiff met Detective Thomas that day to identify Assailant from an NYPD photo book.

134.     Assailant was informed by Ms. Amezquita prior to Assailant's release from NYPD custody about Plaintiff's State Court Proceeding and other efforts to lodge a criminal

complaint against Assailant and that the NYPD had taken Plaintiff's criminal complaint against Assailant while Assailant was in NYPD custody.

135. Once released, Assailant resumed his criminal campaign against Plaintiff. At first, Assailant walked up and down the street outside Plaintiff's apartment building without acknowledging Plaintiff. Then Assailant would approach Plaintiff at a casual walk before feigning attack, suddenly lunging at Plaintiff but stopping short of contact with an audible grunt. Assailant engaged in that behavior with the intent to harass and intimidate Plaintiff and to put Plaintiff in fear for his and his family's safety.

136. Shortly thereafter, Plaintiff found his teenage daughter packing a kitchen knife in her school back pack. When Plaintiff confronted her, she said she was afraid of Assailant and wanted to carry a knife to protect herself. Plaintiff took the knife from her and admonished her not to do any such thing in the future.

137. Because of the NYPD's refusal to arrest Assailant for any crime against Plaintiff, Plaintiff remained unable to obtain an order of protection from the state criminal court and did not qualify for such an order from the state family court because Assailant is unrelated to Plaintiff.

138. Plaintiff communicated by text message to Detective Vrlic that Assailant had begun to harass Plaintiff again.

139. Detective Vrlic and Officer Doe2, the NYPD Hate Crimes detectives assigned to the matter, told Plaintiff that there was nothing the NYPD could do to arrest Assailant because Assailant had sent the death-threat text message from Ms. Amezquita's phone rather than from his own. They did not comment on whether Assailant should be arrested for any of Assailant's

other criminal behavior, either as alleged by Plaintiff or as witnessed by Defendant Officers Ureiba and Garcia. They were hostile towards Plaintiff and appeared to advocate for Assailant.

140. The Hate Crimes Unit Detectives, Detective Vrlic and Officer Doe2, determined that Assailant could not be arrested for crimes against Plaintiff, in disregard of clearly established law and procedure.

141. Further, NYPD ignored Plaintiff's 911 call complaining about Assailant's harassment, assault and other criminal conduct that occurred after Assailant's release from NYPD custody. The identity of the NYPD officer(s) who made the decision to ignore Plaintiff's 911 call is unknown but is identified herein as Officer Doe3. Officer Doe3 ignored Plaintiff's 911 call only because Plaintiff is a man of trans experience.

142. Assailant knew the NYPD ignored Plaintiff's 911 call complaining about Assailant's post-release harassment, assault and other criminal conduct because Assailant saw Plaintiff make that call and wait more than an hour for an NYPD response that never came.

143. Plaintiff told his daughters to call 911 if they encountered Assailant. Plaintiff's oldest daughter asked, "why bother?"

144. Assailant thereafter obtained the new key to Plaintiff's apartment building, presumably obtained from Ms. Amezquita, and made a point to use that key in Plaintiff's presence. Assailant routinely sat on the stoop outside the building's front door to intercept Plaintiff and his family, staring menacingly, moving to physically block their path and otherwise intimidating them.

145. For example, when Plaintiff arrived home at about 1:00 a.m. on August 18, Assailant was waiting on the building's stoop to intercept Plaintiff, so Plaintiff called 911. The NYPD did respond to this 911 call from Plaintiff, but the two responding NYPD officers

dismissed Plaintiff's request for help because they did not understand any of the gender identity and expression issues relating to Assailant's persecution of Plaintiff.

146. Plaintiff had to patiently divulge deeply personal and irrelevant information to the NYPD officers just to convince them to take a complaint from Plaintiff. The officers again declined to take a complaint from Plaintiff.

147. Plaintiff then informed the NYPD officers of his prior conversation with Deputy Inspector Obe and other attempts to have his criminal complaint taken. The officers then called their supervisor, Sergeant Lucky, who eventually directed that a complaint be taken from Plaintiff, three hours after Plaintiff's 911 call and relating only to an incident some weeks prior. The officers did not arrest, detain or speak to Assailant and closed that complaint immediately, thereby preventing any investigation, arrest, or other follow up.

148. Meanwhile, on May 27, 2015, Plaintiff had served upon the Office of the New York City Comptroller a Notice of Claim, pursuant to New York General Municipal Law ("GML") § 50.

149. Defendants' only apparent response to Plaintiff's Notice of Claim was to notice and conduct a so-called 50-h hearing, a pre-litigation examination of Plaintiff before trial made available to municipalities under GML § 50-h to investigate and settle claims against it.

150. On July 31, 2015, Plaintiff appeared as directed and submitted to the examination held by the City pursuant to GML § 50-h. The City's attorney asked numerous personal and inappropriate questions, over Plaintiff's counsel's objection, about Plaintiff's genitalia; he did not ask a single question about Plaintiff's physical, emotional, or any other damages.

151. Although Plaintiff has, therefore, complied with the requirements imposed by GML § 50, those requirements do not apply to Plaintiff's claims under 42 U.S.C. § 1983.

152. Defendant City of New York has not paid, offered to pay, or inquired to settle any portion of Plaintiff's claims.

153. Accordingly, on August 24, 2015, Plaintiff commenced this action and sought a preliminary injunction against Defendants.

154. Although Plaintiff's application was denied, the Court admonished Assailant that any further offensive conduct would not be tolerated. Assailant thereafter ceased his offensive conduct because he had finally been told by a person with authority that violence against Plaintiff was not tolerable.

## COUNT I
(Plaintiff's 42 U.S.C. § 1983 claim against the Officer Defendants)
(Fourteenth Amendment right to equal protection of law)

155. Plaintiff incorporate by reference each and every allegation contained in this Amended Complaint.

156. To prevail on his equal protection claim, Plaintiff must demonstrate the following: (i) compared with others similarly situated, he was selectively mistreated; (2) such selective mistreatment was based on the impermissible consideration that he is a person of trans experience; and (iii) the disparity in his treatment cannot survive intermediate scrutiny. Plaintiff can establish all three of those elements.

157. First, compared with others similarly situated, the Officer Defendants selectively mistreated Plaintiff in several respects, primarily by refusing to discharge their non-discretionary duty to make and file a criminal complaint from Plaintiff -- against Assailant and against the NYPD officers who had previously and wrongfully refused to take a complaint from Plaintiff -- and to investigate that complaint in a non-discriminatory manner.

158.     Several comparators are already known to Plaintiff.  For example, on the morning of May 6, 2015, Plaintiff, his partner, and Ms. Amezquita each complained of roughly equivalent criminal behavior by Assailant, i.e., a pattern of menacing, intimidation and threats by Assailant that caused them to be in reasonable fear for their safety.  In addition, Plaintiff offered to show Officers Garcia and Ureiba written proof of at least two such threats, including a threat to cut Plaintiff's head off, and Officers Garcia and Ureiba actually witnessed Assailant threatening Plaintiff's physical safety.  Despite those facts, Officers Garcia and Ureiba repeatedly refused to take any criminal complaint from Plaintiff but did take criminal complaints from Plaintiff's partner and Ms. Amezquita, both of whom are cis-gendered.

159.     As a further example, later that same day Assailant walked into the 28th Precinct while Officers Ureiba and/or Garcia were processing Ms. Amezquita's criminal complaint against him.  On the basis of Ms. Amezquita's complaint, Officers Ureiba and Garcia arrested Assailant as soon as he was in their mere presence.  In sharp contrast, Assailant was in the NYPD's actual custody for at lest one week after the NYPD had been compelled by the state court to take and file Plaintiff's complaint but the NYPD inexplicably refused to arrest Assailant in connection with Plaintiff's complaint.

160.     In this regard, it is noteworthy that the NYPD Patrol Guide itself establishes a non-discretionary duty for officers to "take and record" all "allegations of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred." NYPD Patrol Guide, Procedure No:  § 207-01.  Similarly, all NYPD officers have a nondiscretionary duty to report all allegations of misconduct against uniformed members of the service, including an allegation that an officer failed to take and file a

complaint, was discourteous or used offensive language.  See NYPD Patrol Guide, Procedure No: 207-31.

161.    The Patrol Guide is, at a minimum, evidence of the standard of police officer conduct that is communicated to NYPD officers by its policy makers and demanded by its supervisors.  Thus, even though police officers may retain a degree of discretion in the exercise of their duties, it is reasonably certain that the standard of conduct articulated in the Patrol Guide describes the conduct typically encountered by persons who interact with the NYPD.

162.    Accordingly, it is equally certain that Plaintiff was selectively mistreated compared to numerous additional comparators that will be identified during discovery in this action.  For example, Plaintiff expects discovery to reveal numerous persons who, like Plaintiff, (i) approached an NYPD officer who was either on duty at a precinct or responding to a 911 call; (ii) informed the officer that the person was a crime victim and wanted to make and file a complaint for aggravated harassment; (iii) described the offensive conduct to the officer; and (iv) showed the officer the written communication evidencing the threat of harm.  Plaintiff expects discovery to reveal that in each such instance, the complainant, unlike Plaintiff, was allowed to make and file a criminal complaint.

163.    As a further example, Plaintiff expects discovery to reveal numerous persons who, like Plaintiff, (i) made and filed a criminal complaint for aggravated harassment, supported by physical evidence and corroborated by witness testimony; (ii) communicated to the responsible officer that the victim wished to obtain an order of protection against their assailant that required an arrest be effected; (iii) were told by the responsible officer that the NYPD would assist the victim in obtaining an order of protection by effecting an arrest if possible under the circumstances; and (iv) whose assailant was in or came into the custody of the NYPD on an

unrelated charge or offense. Plaintiff expects discovery to reveal that in each such instance, and in contrast to Plaintiff's case, the NYPD arrested the assailant already in their custody to allow the victim to obtain an order of protection.

164.     By their affirmative acts, the Officer Defendants selectively withdrew from Plaintiff police protection services that would otherwise have been available in the community, and they did so solely because Plaintiff is a person of trans experience, i.e., a member of a disfavored, but protected, class of persons.

165.     Second, the 28th Precinct Defendants selectively mistreated Plaintiff based on the impermissible consideration that he is a person of trans experience. The Officer Defendants' discriminatory animus is evidenced by several affirmative acts, including for example Officer Cautter's dismissive utterances regarding persons of trans experience and Officer Ureiba's and Garcia's laughing and joking at Assailant's use of transphobic slurs and abuse, including strutting around in an apron while shouting "transsexual" and making specific threats of physical harm to Plaintiff.

166.     The Officer Defendants' discriminatory animus is evidenced also by their protracted, inexplicable refusal to take a criminal complaint supported by physical evidence and relating to conduct actually witnessed by the officers, as well as their refusal to effect an arrest of Assailant in connection with Plaintiff's complaint even though Assailant already was in custody. Any claim that such failure to effect that arrest was a legitimate discharge of discretion is belied by the Officer Defendants' repeated assurances to Plaintiff that, for example, his complaint was being handled appropriately or that they would cooperate with Plaintiff's efforts to obtain an order of protection that required an arrest of Assailant.

167.    Third, the Officer Defendants' conduct was not substantially related to an important government interest.  To the contrary, the NYPD's own policies reflect the important government interest in reporting all allegations as "essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting." NYPD Patrol Guide 207-01.

168.    Further, there is a particularly important government interest in addressing hate crimes, as reflected in the New York State Assembly's declaration that such crimes "tear at the very fabric of free society."  The Officer Defendants' conduct undermines that government interest by condoning and therefore encouraging crimes against persons of trans experience.

169.    Finally, although there is an important government interest in wisely allocating necessarily limited police resources, Plaintiff did not demand that his complaint be taken immediately or even in any particular time frame, nor did he demand that his complaint take precedence over any other police matter.  To the contrary, Plaintiff went on two occasions to the 28th Precinct to wait until any officer had time to take his complaint.  Nor did Plaintiff demand that the NYPD allocate any, much less inordinate, resources to arresting Assailant.  To the contrary, Assailant was already in NYPD custody.

170.    Although the NYPD may have had discretion in how to file and investigate Plaintiff's complaint, on these facts they lacked the discretion to do nothing.

171.    The conduct of the Officer Defendants devastated Plaintiff, who for months lived in constant fear for the safety and well being of himself and his family, including his partner and their four minor daughters.  Every time Plaintiff or one of his family entered or left their building, Plaintiff was concerned that Assailant could be waiting in the hallway, or the basement stairs, or on the landing.  Plaintiff's physical and mental health deteriorated and his relationships

with his partner and children suffered as a result of the weight loss, sleeplessness, exhaustion, isolation, depression, and chronic anxiety that comes with knowing that Assailant could come at any time to kill, torture or terrorize Plaintiff and his family and that Plaintiff would have absolutely no one to call for help when he does.

172.    Separate from the damages caused by Assailant's conduct, the Officer Defendants' abuse of Plaintiff inflicted a distinct, deeper harm all its own.  The Officer Defendants and the agent of their choosing, Assailant, repeatedly violated Plaintiff and did so publicly and with apparent impunity, despite Plaintiff's resort to the chain of command and the courts.  Those acts communicated to Plaintiff's daughters, partner, neighbors, family, to Plaintiff's entire community, that he is beneath the law, beneath civility, a plaything to be harmed or broken with impunity, less than human.  The Officer Defendants' conduct assaulted Plaintiff's personal dignity in a way that no physical attack alone could and inflicts damages orders of magnitude beyond mere physical injury.

173.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

174.    Further, the Officer Defendants' repeated inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by Assailant's conduct, is proof that the Officers focused on the risk of their unconstitutional conduct and deliberately assumed or acquiesced in such risk.  The Officer Defendants therefore acted either with an evil and malicious intent to harm Plaintiff or with a deliberate and callous indifference to Plaintiff's federally protected rights.  Because of that positive element of conscious wrongdoing and the reprehensibility of the Officer Defendants'

conduct, Plaintiff is entitled to punitive damages against the Officer Defendants, in an amount to be determined at trial.

## COUNT II
(Plaintiff's 42 U.S.C. § 1983 claim against the Officer Defendants)
(Fourteenth Amendment right to substantive due process, state-facilitated danger)

175.    Plaintiff incorporate by reference each and every allegation contained in this Amended Complaint.

176.    To prevail on his substantive du process claim, Plaintiff must demonstrate the following: (i) that Plaintiff was denied life, liberty or property; (ii) that the government action was arbitrary, irrational, or motivated by bad faith; and (iii) the government action was so outrageous as to shock the judicial conscience or be oppressive in the constitutional sense. Plaintiff can demonstrate each of those elements.

177.    First, the Officer Defendants deprived Plaintiff of his property rights to the police protection otherwise available in the community.  Ordinarily, police officers are not liable for harm inflicted by private citizens such as Assailant, even where the officers fail to provide adequate police protection.  Here, however, the Officer Defendants are liable because they facilitated the harm that Assailant has inflicted upon Plaintiff and the danger that Plaintiff continually faces.

178.    The Officer Defendants knowingly facilitated Plaintiff's vulnerability to Assailant in numerous respects, including the following:

> (i)    on the morning of May 6, 2015, Officers Garcia and Ureiba witnessed Assailant's smiled and laughed at Assailant's criminal conduct towards Plaintiff, actively encouraging his escalation of criminal behavior;

> (ii)   on the morning of May 6, 2015, Officers Garcia and Ureiba witnessed Assailant's criminal conduct against Plaintiff --

including verbal threats to the life and safety of Plaintiff and his family -- but did nothing to restrain, deter or arrest Assailant;

(iii)     on the afternoon of May 6, 2015, Officers Ureiba and Lt. Cautter, in the presence of Assailant, again refused to take any criminal complaint from Plaintiff, even though Officer Ureiba had witnessed some of that criminal behavior and even though Plaintiff offered physical evidence of Assailant's criminal conduct;

(iv)     on the afternoon of May 17, 2015, Officers Cautter, Abrue, and Rosendary-Phillips again refused to take any criminal complaint from Plaintiff, despite a court order to do so;

(v)     from May 18, 2015 and for one week thereafter, when Assailant was released from NYPD custody, defendants Officer Doe1 and Detective Thomas refused and failed to arrest Assailant for any crime against Plaintiff, even though Assailant knew that Plaintiff had filed a criminal complaint against Assailant on May 18;

(vi)     in or about June 2015, defendants Detective Vrlic and Officer Doe2 refused to arrest Assailant for any crime against Plaintiff that Assailant did not confess to, despite the fact that significant evidence (e.g., the series of threatening text messages obviously from Assailant, the conduct alleged by Plaintiff and witnessed by his neighbors, and the conduct witnessed by Officers Garcia and Ureiba) establishes probable cause to believe that Assailant has committed a crime or infraction against Plaintiff; and

(vii)     in or about July 2015, when Assailant resumed his threatening, menacing, and other criminal behavior, defendant Officer Doe3 refused to respond to Plaintiff's 911 call seeking NYPD assistance and, again, to file a criminal complaint against Assailant.

179.     The Officer Defendants' continued and public inaction -- on multiple occasions over an extended period of time and in the face of physical evidence -- in response to Assailant's escalating campaign of crimes, their active and public encouragement of Assailant's criminal behavior with jokes and laughter, and their refusal to discharge their statutory duty to take Plaintiff's criminal complaint continues to embolden, encourage and condone Assailant's criminal behavior.

180.     The Officer Defendants' affirmative conduct communicates to Assailant that there will be no consequence to committing criminal and violent acts against Plaintiff, increasing the likelihood of violence against Plaintiff or his family.

181.     By intentionally putting Plaintiff in harm's way then sitting back to watch his injury unfold, the Officer Defendants engaged in a deliberate and unconstitutional act designed to inflict extreme and unprovoked pain in their defenseless victim.  Their actions are no different, even if less direct, than chaining a person to a wall for days, or beating a person without provocation, or any other violence against a person.

182.     Second, the Officer Defendants' conduct was arbitrary.  As set forth above in greater detail, the Officer Defendants' conduct failed to comport with the NYPD's official practices regarding the making and filing of criminal complaints.  Further, the Officer Defendants' conduct undermines, rather than advances, the important government interests in accurately reporting crimes and using police resources wisely.

183.     In addition, the Officer Defendants' conduct was motivate by bad faith, discriminatory animus, as evidenced by the Officer Defendants' several affirmative acts, including for example Officer Cautter's dismissive utterances regarding persons of trans experience and Officer Ureiba's and Garcia's laughing and joking at Assailant's use of transphobic slurs and abuse, including specific threats of physical harm to Plaintiff.

184.     Third, the Officer Defendants' conduct shocks the judicial conscience.  This is not a case where an officer makes an error in judgment during exigent circumstances, or has to make a split-second judgment call or manage a difficult situation.  To the contrary, the Officer Defendants had to refuse Plaintiff over and over and over again.  They refused repeatedly at Plaintiff's building on the morning of May 6, 2015.  They refused repeatedly at the 28th Precinct

later that day. The Officer Defendants were presented with and afforded time to read Plaintiff's state-court petition clearly articulating his actual and reasonable fear for his safety and the evidence of Assailant's criminal activity, discussed Plaintiff's petition with the NYPD agency counsel, and refused Plaintiff yet again.

185.    The Officer Defendants refused even to listen to Plaintiff, much less apply the relevant criteria to his complaints. In so doing, the Officer Defendants failed to observe minimal safeguards and exposed Plaintiff to an unacceptable risk of arbitrary and erroneous deprivation of his life, liberty and property.

186.    The only conclusion is that the Officer Defendants' inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by Assailant's conduct, is proof that the Officer Defendants focused on the risk of their unconstitutional conduct and deliberately assumed or acquiesced in such risk. In other words, the Officer Defendants had ample opportunity to deliberate and their actions therefore were deliberate.

187.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

188.    Further, the Officer Defendants therefore acted either with an evil and malicious intent to harm Plaintiff or with a deliberate and callous indifference to Plaintiff's federally protected rights. Because of that positive element of conscious wrongdoing and the reprehensibility of the Officer Defendants' conduct, Plaintiff is entitled to punitive damages against the Officer Defendants, in an amount to be determined at trial.

## COUNT III
(Plaintiff's 42 U.S.C. § 1983 claims as against the City of New York, <u>Monell</u> liability)

189.     Plaintiff incorporate by reference each and every allegation contained in this Amended Complaint.

190.     The City's official custom or policy with respect to the NYPD's treatment of persons of trans experience is to abuse them.  Specifically, to refuse to make or file criminal complaints from crime victims who are persons of trans experience, to refuse to investigate or abate crimes against persons of trans experience, to condone acts of violence and abuse persons of trans experience by police officers against, and to condone and facilitate acts of violence or abuse of persons of trans experience by non-state actors.

191.     The City's custom or policy of violating the rights of persons of trans experience is evidenced by the numerous acts of abuse set forth in detail in this Amended Complaint.  Those acts encompass the culpable conduct of scores of police officers and the actionable conduct of two dozen police officers acting across three boroughs and over the course of two years.

192.     The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the numerous acts of abuse set forth in actions brought before this Court, for example the complaint in action captioned *Jennifer Louise Lopez v The City of New York et al.*, United States District Court for the Southern District of New York, Case No. 15-cv-7020 (<u>NRB/rjm</u>).  Ms. Lopez is a woman of trans experience who repeatedly, over the course of two years, asked to make and file a complaint of criminal activity directed at her by her neighbors. Despite the fact that her complaints were supported by, for example, audio recordings of threats to her life and physical safety, the responding officers never took a single complaint from Ms. Lopez.  Instead, the officers either dismissed Ms. Lopez or, worse, joked with her neighbors about her status as a woman of trans experience.

193.    The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the case of Rachel Burrous, a woman of trans experience who called 911 on August 10, 2015 to report that she had been a victim of domestic abuse in her Brooklyn apartment.  Despite the facts that Ms. Burrous bore obvious physical injuries from her spouse's physical attack, that Ms. Burrous had an audio recording of her spouse's attack on her, and that her spouse's cross-allegations of abuse were not supported by evidence and flatly contradicted by the audio recording, the responding officers arrested Ms. Burrous and not her spouse.  In fact, the NYPD refused even to make or file a complaint from Ms. Burrous or to listen to the audio recording of her spouse's attack on Ms. Burrous.  Ms. Burrous was thereafter mistreated by the NYPD, who chained her to a wall for hours while other detainees were left unchained, and who referred to her as "it" and committed other acts of verbal abuse and transphobic slurs.

194.    The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the Shagasyia Diamond, a woman of trans experience who on January 1, 2014 was visited at her Bronx apartment by several NYPD officers responding to a neighbor's noise complaint.  Despite the facts that no one had complained of any domestic abuse or violence, that both Ms. Diamond and her spouse steadfastly denied any such violence, and that there were no specific, articulable facts to support a conclusion that any such abuse had occurred, Ms. Diamond was arrested without probable cause, physically abused and verbally humiliated by transphobic slurs for hours, then released into a blizzard without a coat, boots or other appropriate gear, which clothing the arresting officers had specifically denied to Ms. Diamond.  Ms. Diamond was never charged with any crime or offense in connection with that false arrest.

195.    Thereafter, in the late summer or fall of 2015, Ms. Diamond was punched in the head and face by unknown assailants at a bodega near her Bronx apartment.  The responding

officers refused even to take a criminal complaint from Ms. Diamond, despite the fact that she bore obvious wounds from the attack, and did so solely because she is a woman of trans experience. The officers instead threatened to restrain Ms. Diamond.

196.     The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the numerous acts of abuse that have been widely reported in the media over the past decade. In a September of 2007, for example, the NYPD violently arrested and pepper-sprayed peaceful demonstrators at a celebration of the Sylvia Rivera Law Project, an organization that advocates for and provides free legal services to low-income people of color who are transgender. In 2011, the NYPD arrested a man of trans experience together with numerous other people at an Occupy Wall Street event. All of the cis-gendered protesters arrested with him were processed and released promptly. The NYPD chained the man of trans experience to a wall for eight hours, without provocation or cause, before processing and releasing him.

197.     In February 2012, the NYPD repeatedly humiliated a woman of trans experience with derogatory epithets and taunts after they arrested her. The NYPD attached her to a fence, with her arm painfully chained above her head, for more than a day.

198.     In August 2013, three women of trans experience were attacked by seven or more men who were enraged by their gender expression. The women were beaten -- one of them to death -- right in front of the NYPD's Housing Bureau Precinct. One Assailant confessed a week after the murder but was not even indicted, for manslaughter not murder, until March 2015.

199.     On October 12, 2014, four men attacked and severely beat a woman of trans experience in Brooklyn, hurling slurs and epithets at her soul as they hurled fists and boards at her body. The victim, an American Indian, suffered a traumatic brain injury. She was beaten so

badly that a portion of her skull had to be removed. Advocates for the victim involved with the case publicly criticized the NYPD detectives for not working diligently. No arrests were made.

200. Hundreds of other persons of trans experience have been abused by the NYPD but will never report that abuse, much less seek redress in a court of competent jurisdiction, either because of the belief that their complaints will not be heard or will result in mistreatment, or because of the danger of publicly identifying one's self as a person of trans experience, or because persons of trans experience are far more likely than cis-gendered persons to suffer homelessness, poverty, substance abuse and other impairments to asserting their rights. Anecdotally, a September 2015 New York Times article about the NYPD's long and sordid history of abusing persons of trans experience describes a transgender forum where each of the more than 200 attendees admitted that they had been mistreated by the NYPD; not a single one had complained.

201. By force of persistent practice, the City's official custom or policy of violating the rights of persons of trans experience was the moving force that caused the denial of Plaintiff's constitutional rights and caused Plaintiff's damages.

202. These discriminatory practices of the City are so persistent and widespread as to constitute a custom or usage with the force of law, and the discriminatory acts of subordinate and supervisory officers so manifest as to imply the constructive acquiescence of senior policy-making officials.

203. Even if, and in the alternative, the finder of fact in this action determines there is no such policy of violating the rights of persons of trans experience, the NYPD and the City's policy makers have for years known about innumerable acts of police officers abusing persons of trans experience.

204.     It is noteworthy that in June 2012, the City announced that negotiations between the City, NYPD and LGBT advocacy groups concerning the NYPD's abuse of persons of trans experience had resulted in revisions to the NYPD Patrol Guide that, "address an array of unique problems that transgender and gender non-conforming New Yorkers face when they are arrested or detained by the police, including prohibiting the use of incorrect gender pronouns and "the dangerous practice of cuffing [persons of trans experience] to benches and rails while in police custody."

205.     In light of that pervasive history and the historic animus against persons of trans experience, the City's and NYPD's policy makers know to a moral certainty that its officers will face situations where the rights of persons of trans experience will be threatened or violated by fellow officers or non-state actors, will attempt to make and file a criminal complaint about those criminal acts, and will be refused the right to do and instead subjected to further abuse.

206.     The City's and NYPD's policy makers know to a moral certainty that such situations will be difficult for officers who either are unfamiliar with the issues peculiar to persons of trans experience, who are confronted with a colleague's or a supervisor's abuse of a person of trans experience, or who themselves bear some degree of animus, even if subconsciously, against persons of trans experience.

207.     Adequate training regarding those issues will make it substantially less likely that the rights of persons of trans experience will be violated.

208.     The City's failure to properly train or supervise their subordinates in the comprehension and observation of an adequate policy regarding the treatment of persons of trans experience amounts to deliberate indifference to the rights of those who come in contact with the municipal employees.

209.    Accordingly, Plaintiff are entitled to compensatory damages in an amount to be determined at trial but believed to exceed $6,000,000, plus reasonable attorneys' fees and costs.

**COUNT IV**
(Plaintiff's 42 U.S.C. § 1983 claims against the City of New York)
(Permanent injunction)

210.    Plaintiff incorporate by reference each and every allegation contained in this Amended Complaint.

211.    Plaintiff is entitled to permanent and preliminary injunctive relief in connection with his federal claims because Plaintiff can demonstrate the imminent threat of irreparable harm, a substantial likelihood of success on the merits, and that the balance of the equities and public interest favor injunctive relief.

212.    Specifically, in the absence of injunctive relief, Plaintiff and other persons of trans experience will remain vulnerable to the NYPD's systemic and pervasive deprivation of their rights secured by the Fourteenth Amendment to the Constitution of the United States.

213.    Plaintiff has no adequate remedy at law because the affronts to his dignity and ongoing risk of physical violence and other abuse, either at the hands of the NYPD or persons acting without fear of repercussion for such violent acts -- cannot be compensated by money damages.

214.    Further, any retrospective relief obtained by Plaintiff against the Officer Defendants cannot address the threat of suffering further constitutional violations by other NYPD officers acting further to the NYPD's discriminatory policy.

215.    The public interest, as expressed for example in the Hate Crime Law, strongly favors enjoining systemic abuse of persons of trans experience, and the balance of the equities tips decidedly in Plaintiff's favor.

216.     Accordingly, Plaintiff is entitled to a preliminary and permanent injunction: (i) enjoining the City from refusing to take criminal complaints from crime victims who are persons of trans experience; (ii) compelling the City to adopt, promulgate and enforce policies and procedures to assure that persons of trans experience receive from the NYPD equal protection of law, including freedom from violence at the hands of police officers and freedom from acts and omissions of police officers that communicate, directly or indirectly, to non-state actors that violence and other criminal acts against persons of trans experience will be tolerated or condoned;  (iii) compelling the City to examine and adjust its polices and practices to assure that respect is afforded to the human and civil rights of persons of trans experience; and (iv) awarding Plaintiff such other and further relief as is just and proper.

## COUNT V
(Plaintiff's New York Civil Rights Law § 79-n claims against all Defendants)

217.     Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

218.     The Officer Defendants, City and Assailant have inflicted harm upon Plaintiff in whole or in substantial part because of their belief or perception regarding his gender identity and expression.

219.     Pursuant to New York Civil Rights Law § 79-n, those facts entitle Plaintiff to an injunction enjoining any further violation of Plaintiff's rights.

220.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

221.     Further, Plaintiff is entitled to an injunction enjoining and restraining Defendants from any further violation of Plaintiff's rights based upon Plaintiff's gender identity and expression.

## COUNT VI
(Plaintiff's New York City Human Right Law claims against Assailant and the City)

222.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

223.    Plaintiff is the victim of unlawful, discriminatory harassment and violence at the hands of Assailant and the City.

224.    Further, the City's official practice and policy of discrimination against persons of trans experience is the driving, causative force behind the damage inflicted by the Officer Defendants.

225.    Assailant's and the City's discriminatory conduct has interfered with Plaintiff's exercise or enjoyment of his rights as secured by the constitution or laws of the United States, the constitution and laws of the State of New York, and the laws of the City of New York.

226.    Defendants' interference with Plaintiff's rights is motivated in whole or in part by the Plaintiff's actual or perceived gender identity and expression.

227.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

228.    Further, Plaintiff is entitled to an injunction enjoining and restraining Assailant and the City from any further violation of Plaintiff's rights based upon Plaintiff's gender identity and expression.

## COUNT VII
(Common law assault as against Assailant)

229.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

230.    Assailant repeatedly and intentionally placed Mr. White in apprehension of imminent harmful or offensive contact.

231.    Accordingly, Mr. White is entitled to compensatory damages, in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

**Pursuant to the Seventh Amendment to the Constitution of the United States and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demand a trial by jury.**

**WHEREFORE**, Plaintiff respectfully pray for judgment against Defendants as follows:

(1)    that Assailant, Officer Defendants and the City of New York, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the City who receive actual notice of the Court's order by personal service or otherwise, be ordered as follows:  (i) enjoining the City from refusing to take criminal complaints from crime victims who are persons of trans experience; (ii) compelling the City to adopt, promulgate and enforce policies and procedures to assure that persons of trans experience receive from the NYPD equal protection of law, including freedom from violence at the hands of police officers and freedom from acts and omissions of police officers that communicate, directly or indirectly, to non-state actors that violence and other criminal acts against persons of trans experience will be tolerated or condoned;  (iii) compelling the City to examine and adjust its polices and practices to assure that respect is afforded to the human and civil rights of persons of trans experience; and (iv) enjoining Defendants from committing any further discriminatory acts against Plaintiff.

(2)     awarding Plaintiff compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000;

(3)     awarding Plaintiff interest, including pre-judgment interest, on the foregoing sums;

(4)     awarding Plaintiff his costs in this civil action, including reasonable attorneys' fees and expenses, pursuant to 42 U.S.C. § 1983; and

(8)     awarding Plaintiff such other and further relief as the Court may deem just and proper.


Dated: Bronx, New York
        January 28, 2016

LAW OFFICE OF DONALD R. DUNN, JR.


By: _____/S/_____
      Donald R. Dunn, Jr. (DD0069)

441 East 139th Street
Bronx, New York 10454
347-270-1863
Donald@drdunnlaw.com