```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  09/12/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MARLOW WHITE,                                        :
                                                     :
                                    Plaintiff,       :
                                                     :               1:15-cv-6696-GHW
                 -against-                            :
                                                     :               MEMORANDUM OPINION
                                                     :               AND ORDER
THE CITY OF NEW YORK, NYPD OFFICER                   :
UREIBA, OFFICER GARCIA, LIEUTENANT                   :
CAUTTER, OFFICER ROSENDARY-PHILLIPS,                 :
OFFICER ABRUE, DETECTIVE THOMAS,                     :
DETECTIVE VRLIC, and OFFICERS DOE 1-3,               :
                                                     :
                                    Defendants.      :
--------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

        In the spring of 2015, Plaintiff Marlow White and his partner, Nathalie Lewis, were

threatened and intimidated by Napoleon Monroe, a pattern of harassment that culminated in a 911

call on May 6, 2015.  According to White, the police repeatedly refused to take his complaint, smiled

and smirked as Monroe harassed him, and treated him with obvious disdain after learning that he is

a man of trans experience.  Monroe's harassment continued, and White alleges that the police

discriminated against him because he is a transgender man when they failed to respond to his

subsequent requests for intervention.  He brings this action under 42 U.S.C. § 1983, alleging that the

NYPD's discrimination against him violated his Fourteenth Amendment rights.  Although White

alleges discriminatory intent with respect to a subset of the individual defendants, those defendants

are shielded by qualified immunity and White has failed to state a claim against the City of New

York.  Therefore, the motion to dismiss is GRANTED.

I.       **Background**[1]

White and Lewis reside in a co-operative building located on West 111th St. (the "co-op").
White has lived in the co-op for approximately twenty years, including while he transitioned.
Amended Complaint ("AC") ¶ 37, ECF No. 68.  He serves on the co-op board with several of his
neighbors, including Ana Amezquita.  AC ¶¶ 38, 40.

On March 20, 2015, White delivered some documents to Amezquita and she invited him
into her apartment and introduced him to her "paramour," Monroe.  AC ¶ 38.  During the course of
that meeting, Monroe told White that he, Monroe, was uncomfortable with Amezquita discussing
"their business" with White.  AC ¶ 39.  White told Monroe that there was nothing to be concerned
about, to which Monroe responded "I don't want to hear that s**t!  Because I'm a real man with a
real d**k!"  AC ¶ 41.  Once White understood that Monroe's hostility was motivated by the fact that
White is a transgender man, White asked Monroe not to speak to him anymore and left.  AC ¶¶ 42-
43.

Thereafter, when Monroe and White saw each other around the co-op Monroe would make
a point to stop and say hello to White "as if nothing happened."  AC ¶ 44.  Each time, White would
ignore Monroe, and over time Monroe became increasingly agitated by these encounters.  *Id.*

On May 3, 2015, White received several text messages sent from Amezquita's phone that
White asserts were sent by Monroe.  AC ¶ 45.  The messages appear to relate to Monroe's
perception that White wanted to protect Amezquita from Monroe, who, as discussed below, was
eventually arrested on domestic violence charges.  In the text messages, Monroe said that he was
going to speak to White's partner, Lewis, "and see if she needs my company when you and her go
threw [sic] things," and that he would treat Lewis "way better than Ana."  Ex. A, ECF No. 71-1; AC

---

[1] Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of
this Rule 12(b)(6) motion.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet
that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

¶ 48.  Monroe then said "You wanna play dumb, let's play motherf**ker!  I just slapped Ana.  Come protect her!  I'll cut your f**king head off lil man."  Ex. A; AC ¶ 49.

White understood these text messages to be a threat to his life.  AC ¶ 49.  He and his family made a safety plan that included frequent communication with White's children in anticipation of a physical attack by Monroe.  AC ¶ 52.  White also requested an emergency meeting with the co-op board and shareholders regarding Monroe.  AC ¶ 53.  At the meeting, which was held on May 5, 2015, the shareholders decided to change the co-op's locks "to provide its residents with some measure of security against [Monroe]."  *Id.*  White alleges that Amezquita told Monroe about this meeting.  AC ¶ 54.

On May 6, 2016 at approximately 8:15 a.m., Monroe stopped Lewis as she was leaving for work and asked if she was White's wife.  AC ¶ 56.  Lewis told Monroe to not ask her questions and to leave her alone, and Monroe shouted at her that he was "going to f**k you up" and "going to f**k your transsexual husband up."  AC ¶¶ 57-58.  Monroe followed Lewis when she went back inside the co-op to ask Amezquita to "come get" Monroe.  AC ¶ 61.  After hearing Lewis yelling "leave me alone" through the apartment intercom, White went downstairs; other neighbors also began to gather, and several called 911.  AC ¶¶ 62-64, 66.  Monroe repeatedly asked Lewis if she wanted to see his penis and shouted "transsexual" at White.  AC ¶ 65.

When New York City Police Department ("NYPD") Officers Ureiba and Garcia arrived they began to speak with Lewis, but as soon as Lewis explained that Monroe had harassed White because he is a man of trans experience the officers "expressed obvious distaste for Plaintiff, their entire demeanor changed, and they became completely uncooperative."  AC ¶¶ 67-69.  Officers Ureiba and Garcia refused to take complaints from Lewis and White, and refused to look at the text messages from Monroe on White's phone.  AC ¶ 70.

As White, Lewis, and their neighbors tried to tell the officers what had happened, Monroe continued harassing White and Lewis in view and earshot of the assembled neighbors and officers.

Specifically, he walked up and down the block shouting "transsexual" and reaching into his pants to grab his penis while shouting at Lewis asking if she wanted to see his penis and proclaiming that he was a "real man with a real d\*\*k."  AC ¶¶ 72-73.  He also purported to place a telephone call to a "grandmaster," and asked the grandmaster to "take care of this transsexual and these people."  AC ¶ 74.  At one point, Monroe went into Amezquita's apartment and came out wearing an apron as he taunted and mocked White.  AC ¶ 75.  According to White, Officers Ureiba and Garcia "did nothing but smirk" when Monroe came out in the apron.  *Id.*  In addition, when Monroe said "officer you know me, I'm Napoleon," Officer Garcia turned around and smiled.  AC ¶ 76.

When someone asked the officers if they were going to take a report, Officer Ureiba responded that Monroe "just said the same thing," and the officers said that they would wait until "someone is dead and then come pick up the pieces."  AC ¶ 77.  Only when Monroe approached Lewis—who was standing next to Officer Garcia—and again asked if she wanted to see his "real d\*\*k," which he began to remove from his pants, did Officer Garcia direct Monroe to step back and take Lewis's complaint.  AC ¶¶ 88-89.

As Officers Ureiba and Garcia were preparing to leave, White approached them and again asked to show them the text messages.  AC ¶ 91.  Officer Ureiba shouted "Step back you, I don't know if you have a weapon on you or something."  *Id.*  Amezquita also approached the officers and informed them that she wished to file a criminal complaint against Monroe.  AC ¶ 92.  Although they refused to look at the texts on White's phone, Officers Ureiba and Garcia took Amezquita with them to the 28th Precinct (the "police station") where they took her complaint, and later that day arrested Monroe on domestic violence charges.  AC ¶¶ 93, 96.

Around noon on May 6, 2015, White and Lewis went to the police station and asked Lieutenant Cautter, the commanding officer, for help filing a criminal complaint.  AC ¶ 94.  White alleges that Lt. Cautter was aware of the nature of his complaint against Monroe and that Lt. Cautter treated White "with obvious disdain."  AC ¶ 95. Lt. Cautter sent White to speak with Officer Ureiba,

who again refused to look at the text messages or take White's criminal complaint, as did the other officers at the police station.  AC ¶¶ 96-98.

On May 15, 2016, White—with the assistance of counsel—obtained a temporary restraining order ("TRO") directing the 28th Precinct's commanding officer to accept White's complaint and to assist with White's application for an order of protection against Monroe. AC ¶¶102-04.  Two days later, White's counsel served the TRO and White's Verified Petition in support of the TRO on Lt. Cautter, who mockingly exclaimed "man of trans experience" as he read the papers.  AC ¶¶ 106-08. Lt. Cautter directed Officer Rosendary-Phillips to take White's statement.  AC ¶ 109.  Officer Rosendary-Phillips reviewed the text messages from Monroe and interviewed White, interrupting the interview at several points to leave the interview room and speak with Lt. Cautter and Officer Abrue, the Integrity Officer on duty that afternoon. AC ¶¶ 26, 109-113.  White asserts that throughout the interview Officer Rosendary-Phillips had a hostile attitude toward him, and that ultimately Lt. Cautter and Officers Rosendary-Phillips and Abrue refused to file a criminal complaint based on White's allegations.  AC ¶¶ 109, 115.

On May 18, 2015, White's counsel informed the NYPD's attorney that White would seek to hold the NYPD in contempt for failing to comply with the TRO.  AC ¶ 116.  That evening, NYPD officers went to the co-op to take White's complaint, but White alleges that the complaint does not reflect the totality of the criminal conduct he reported.  AC ¶¶ 118, 123-24.  White told Detective Thomas, the lead detective investigating White's complaint, that he wanted to apply for an order of protection, but Detective Thomas told White that he could not obtain an order of protection unless Monroe was arrested in connection with White's complaint—and Monroe was released from NYPD custody a week later without being arrested for any crimes against White.  AC ¶¶ 130-32.

After Monroe was released, he resumed harassing White. AC ¶ 135.  Monroe would walk up and down the street outside the co-op without acknowledging White, and then "feign attack" by "suddenly lunging at [White] but stopping short of contact with an audible grunt." *Id.*  White

contacted Detective Vrlic, the Hate Crimes detective assigned to his complaint, via text message, and reported Monroe's harassment.  AC ¶¶ 138-39.  White alleges that Detective Vrlic and an Officer Doe were hostile toward him and "appeared to advocate" for Monroe.  *Id.*

At some point after Monroe's release from custody but prior to August 18, 2015, White called 911 regarding Monroe's continued harassment.  White alleges that this call was ignored, and that Monroe knew White's call was ignored because he saw White make the call and wait "for an NYPD response that never came."  AC ¶ 142.

At some point after White's 911 call, Monroe obtained the new key to the co-op and would sit outside the building's front door and stare at White and his family and physically block their path.  AC ¶ 144.  On August 18, 2015, when White arrived home around 1:00 a.m., Monroe was sitting on the co-op's stoop and White called 911.  AC ¶ 145.  The officers who responded eventually took White's complaint, but immediately closed it.  AC ¶¶ 145-47.

White filed this lawsuit on August 24, 2015.  On September 4, 2015, this Court held a hearing and denied White's motion for entry of a preliminary injunction enjoining Monroe, who was originally a defendant in this case, from further harassing White and enjoining the City of New York (the "City") from "further discriminatory conduct" against White.  On December 4, 2015, Monroe moved to dismiss White's complaint.  *See* Dkt. 47.   The City, Lt. Cautter, Detectives Thomas and Vrlic, and Officers Abrue, Garcia, Rosendary-Phillips, and Ureiba filed their first motion to dismiss on December 14, 2015; thereafter, White filed his amended complaint.  *See* Dkt. Nos. 48 and 68.  White and Monroe later settled their claims against each other and Monroe was dismissed from this case on February 1, 2016.  *See* Dkt. No. 69.  The remaining defendants ("Defendants") moved to dismiss the Amended Complaint on February 22, 2016, White filed his opposition on March 25, 2016, and Defendants replied on April 9, 2016.  *See* Dkt. Nos. 70, 77, 81.

## II.      Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  Legal conclusions, unlike facts, are not entitled to an assumption of truth.  *Iqbal*, 556 U.S. at 679.  A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

## III.     Discussion

White contends that he has stated a claim for a violation of his Fourteenth Amendment rights under two different theories.  First, he claims that his right to equal protection was violated when the police refused to take his complaint on May 6 and 17, 2015, a refusal he asserts was motivated by a policy of discrimination against transgender individuals.  Second, he claims that his substantive due process rights were violated when the NYPD sanctioned Monroe's harassment of White, increasing the danger to White and his family.  Defendants counter that White has failed to state a claim under either theory, but that even if White had stated a claim the individual officer defendants would be entitled to qualified immunity and White's allegations would be insufficient to state a claim for municipal liability.

### A.      Consideration of Exhibits

As an initial matter, the Court must decide whether it can consider certain documents submitted by the parties at this stage of litigation.  In conjunction with their motion papers, Defendants have submitted two exhibits:  Exhibit A is a copy of the text messages purportedly sent by Monroe to White, and Exhibit B is a copy of the Verified Petition for Mandamus to Compel in the matter of Marlow White v. NYPD, *et al.*, Index No. 700844/2015 (N.Y. Sup. Ct., May 15, 2015). Plaintiff has submitted ten exhibits with his opposition to the motion:  (1) a copy of the same text messages submitted by Defendants as Exhibit A; (2) a copy of the NYPD criminal complaint taken from Ms. Lewis on May 6, 2015; (3) a copy of the same Verified Petition submitted by Defendants as Exhibit B; (4) a copy of the May 15, 2015 Order to Show Cause and Temporary Restraining Order against Mr. Monroe; (5) a copy of the NYPD criminal complaint taken from Plaintiff on May 18, 2015; (6) a copy of the NYPD criminal complaint taken from Plaintiff on August 18, 2015; (7) Plaintiff's Amended Complaint; (8) a copy of the transcript of the Preliminary Injunction hearing held before this Court on September 4, 2016; (9) a copy of NYPD Patrol Guide, Procedure No. 207-01; and (10) a copy of NYPD Patrol Guide, Procedure No. 207-31.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  "To be incorporated by reference, the Complaint must make a clear, definite, and substantial reference to the documents."  *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  *DiFolco*, 622 F.3d at 111 (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

The text messages, the state court documents, and the NYPD Patrol Guide procedures are all referenced in and integral to the complaint. The three criminal complaints are not. Such documents may only be considered integral when it is clear that the plaintiff *relied* on the documents in preparing his complaint. *Chambers*, 282 F.3d at 153. Here, while White included allegations that the three complaints—one from Lewis and two from White—were taken, there is no indication that the resulting documents themselves were used in any way in drafting the Amended Complaint, and the Court will not consider them. The Court will, however, take judicial notice of the existence of the three complaints. *See Williams v. City of New York*, No. 14-cv-5123-NRB, 2015 WL 4461716 at *2 (S.D.N.Y. July 21, 2015) (contents of police records not relied upon in drafting the complaint cannot be considered at the motion to dismiss stage, although the court took judicial notice of their existence).

### B.     Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburn Living Ctr.*, 473 U.S. 432, 439 (1985). "Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause." *Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415, 438 (2d Cir. 2009) (citing *Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)). Before the Court can evaluate whether the Amended Complaint states an equal protection claim, however, it must determine the framework within which White's allegations should be analyzed.

#### 1.   *White's Claim Is Not a Selective Enforcement Claim*

Defendants have characterized White's equal protection claim as a selective enforcement claim, and White has not contested that categorization. Although the parties have approached the equal protection claim through this lens, the Court does not view White's claim as a selective enforcement claim, which obviates the need for White to plead similarly situated comparators.

"A plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of similarly situated individuals." *Pyke v. Cuomo*, 258 F.3d 107, 108-09 (2d Cir. 2001).  By contrast, "[t]here are two types of equal protection claims that require similarly situated comparators . . . selective enforcement or selective treatment claims . . . [and] 'class of one' claims." *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) (citations omitted).  As the Second Circuit explained in *Pyke*, the additional burden to show the existence of similarly situated comparators arises in selective prosecution claims "because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute."  258 F.3d at 109 (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).  Such selective prosecution claims, also called selective enforcement or selective treatment claims, are brought by plaintiffs against whom state actors selectively enforced the law in an allegedly discriminatory manner.  *See e.g.*, *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980) (appellees' equal protection claim regarding suspension of permit for their dairy farm "boils down to one of selective enforcement or prosecution by a state official pursuant to a lawful state regulation"); *Mosdos Chofetz Chaim, Inc.*, 815 F. Supp. 2d 679 (analyzing selective enforcement claim in the context of allegedly discriminatory application of zoning laws); *see also Adkins v. City of New York*, 143 F. Supp. 3d 134, 138 (S.D.N.Y. 2015) (where multiple men were arrested for the same offense and taken together to the police station, but the cisgender men were held together in a general cell and provided with food while the sole transgender man was handcuffed to a wall without food, the transgender plaintiff "adequately alleged that he was treated differently than others similarly situated."); *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 591 (S.D.N.Y. 2015) (transgender woman who was housed in an all-male prison and was told by guards that she could not attend religious services with other prisoners because of "her hair" and "her sexuality" sufficiently alleged that she was treated differently than others similarly situated.).

10

Here, however, White's claim is not that he was singled out as a target against whom the law was enforced, but rather that the police refused to take his complaints after learning that he is a transgender man.  "The state may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."  *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).  "Indeed, the 'selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection.'"  *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 261 (E.D.N.Y. 2014) (quoting *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000)).  Plaintiffs pursuing such "traditional" equal protection claims are not required to plead similarly situated comparators.  *Pyke*, 258 F.3d at 110; *Okin*, 577 F.3d at 439 (victim of domestic violence arguing that her right to equal protection was violated need not necessarily allege similarly situated comparators, but was still required "to show that it was her gender, and not some other characteristic, that motivated the treatment she received.").

While comparators are not required, traditional equal protection plaintiffs must still allege facts supporting a plausible inference that "discriminatory intent was a motivating factor" in order to state an equal protection claim.  *Okin*, 577 F.3d at 438 (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)).  Such plaintiffs may show discriminatory intent by pointing to animus on the part of individual officers, an official municipal policy of discriminatory treatment, or a pattern of failing to provide an adequate police response to a protected class.  *Carmichael*, 34 F. Supp. 3d at 262 n.8.  "[A] simple failure of diligence, perception, or persistence in a single case involving minority victims," on its own, will not suffice.  *Id.* at 262 (citing *Okin*, 577 F.3d at 438-39 and *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1140 (E.D. Cal. 2004)).

2. *White Adequately Alleges Discriminatory Intent with Respect to Only Some Defendants*

White has not alleged discriminatory animus with respect to all of the individual defendants. His allegations with respect to Officers Abrue and Rosendary-Phillips and Detectives Thomas and Vrlic can be distilled to an accusation that they were not as responsive to White's concerns as he wishes they had been, but he does not offer specific facts supporting an inference that those officers were motivated by discriminatory animus. "[S]howing that one officer or even the police department as a whole acted slowly" in response to his complaints is not sufficient, in and of itself, to show discriminatory intent. *See Moua*, 324 F. Supp. 2d at 1140. Nor do White's allegations that the officers deviated from the patrol guidelines by declining to take his complaint support an inference of discriminatory intent on their own. *See Okin*, 577 F.3d at 438-39 (repeated deviations from mandatory arrest statute and police department policy are not grounds for an inference of bias).

But with respect to Officers Garcia and Ureiba and Lt. Cautter, White does plead facts showing discriminatory animus. He alleges that on the morning of May 6, 2016, Officers Garcia and Ureiba were listening to his and Lewis's story, but that their demeanor changed when they learned he was a transgender man, and that they became "uncooperative" and expressed "obvious distaste" for him. White also alleges that the officers "smirked" and "smiled" as Monroe continued to harass White in their presence, and that they said they would "wait until someone is dead and then come pick up the pieces." Defendants argue that this statement was "undoubtedly sarcasm," Defs.' Br. at 3, but at this stage of litigation the Court is bound to draw all reasonable inferences in White's favor, and cannot discount the statement by inferring—to White's detriment—that the officers were being sarcastic rather than dismissive of White as a man of trans experience. White further alleges that when presented with the TRO and verified petition ordering NYPD to accept White's complaint, Lt. Cautter read silently except to exclaim, in a mocking manner, "man of trans experience." These allegations are sufficient to state a plausible claim of discriminatory intent on the part of Officers

Ureiba and Garcia and Lt. Cautter. *See Adkins*, 143 F. Supp. 3d at 138 (plaintiff plausibly alleged discriminatory intent when officers' reactions to learning of a plaintiff's transgender status "included gawking, giggling, and inquiring about his genitalia").

   3. *Individual Defendants are Entitled to Qualified Immunity*

Because White has alleged discriminatory intent on the part of three of the individual defendants, the Court next considers the level of scrutiny to apply to his claim. *Adkins*, 143 F. Supp. 3d at 138. Defendants argue that their treatment of White is subject to the lowest level of scrutiny, rational basis review. *See Lopez v. City of New York*, 2009 WL 229956 at *13 (S.D.N.Y. Jan. 30, 2009) (transgender plaintiff's equal protection claim subject to rational basis review); *but see Adkins*, 143 F. Supp. 3d at 141 (concluding that transgender persons are a quasi-suspect class and thus entitled to intermediate scrutiny). White contends that intermediate scrutiny should apply because discrimination against transgender persons is sex-based discrimination, *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011), and because transgender persons are a "quasi-suspect class." *See Adkins*, 143 F. Supp. 3d at 139-141 (citing *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) *aff'd on other grounds* 133 S. Ct. 2675 (2013)). Although White argues that Defendants' actions do not withstand intermediate scrutiny, he does not claim that their actions are unconstitutional if evaluated under rational basis review.

At this time the Court need not determine which level of scrutiny applies, because qualified immunity shields Officer Garcia, Officer Ureiba, and Lt. Cautter from liability. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether a state actor is entitled to qualified immunity, courts consider whether the facts alleged "make out a violation of a constitutional right," and whether "the right at issue was 'clearly established' at the time of defendant's alleged

misconduct.'"  *Id.* at 232.  After the Supreme Court's decision in *Pearson*, district courts may consider these two factors in whichever order is most appropriate "in light of the circumstances in the particular case at hand."  *Id.* at 236.  In this case, it is appropriate to resolve the issue of qualified immunity by considering clearly established law at the time of the alleged incidents, and the Court declines plaintiff's request to expand the application of intermediate scrutiny to a new suspect, or quasi-suspect, class on the basis of untested allegations in a complaint alone.

Police officers are entitled to immunity if their actions were "objectively legally reasonable in light of the legal rules that were clearly established at the time [those actions] [were] taken."  *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999)).  To date, neither the Supreme Court nor the Second Circuit has held that transgender plaintiffs are members of a protected or suspect class whose equal protection claims are entitled to heightened scrutiny.  *See Okin*, 577 F.3d at 433 ("We look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right.").  Nor has the Second Circuit held, as the Eleventh has, that discrimination against transgender individuals constitutes sex-based discrimination.  *See Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).  Four years ago, in *Windsor v. United States*, the Second Circuit held "that homosexuals compose a class that is subject to heightened scrutiny."  699 F.3d at 185.  The *Windsor* court did not hold that transgender persons are also a quasi-suspect class.  *Id.* While there is certainly an argument to be made that the *Windsor* holding should be expanded to transgender persons, see *Adkins*, 143 F. Supp. 3d at 139-141, it was not the clearly established law of this Circuit at the time of the incidents described in the amended complaint.  Thus, the individual officers implicated here could not be expected to anticipate that their actions would be subject to any standard more stringent than rational basis review, and because their actions were not arbitrary or irrational they meet that standard.

Deciding to arrest Monroe on charges of domestic violence and deciding to take a complaint from Lewis while declining to take White's complaint were not arbitrary or irrational actions. Amezquita had already been subjected to violence at Monroe's hands when she approached Officers Garcia and Ureiba and asked to make a complaint.  In contrast, neither White nor Lewis alleged that Monroe had ever touched them.  It was rational for the officers to arrest Monroe based on the only incidents of physical violence alleged by any complaining witness—Amezquita's allegations of domestic violence.  Their refusal to accept White's criminal complaint while ultimately accepting Lewis's also did not violate constitutional due process under rational basis review.  Officers Garcia and Ureiba had originally declined to take either White or Lewis's complaints, but accepted Lewis's after Monroe reached into his pants and began to expose himself to Lewis while she was standing next to Officer Garcia.  The Court cannot conclude that it was a violation of constitutional due process on a rational basis review for the officers to treat indecent exposure in their presence differently than the verbal harassment that Lewis and White had reported up to that point, or to decline to accept complaints based on verbal harassment.  Police officers are afforded discretion in enforcing the law, and because it was objectively reasonable for Officers Garcia and Ureiba and Lt. Cautter to believe that their actions were lawful they are entitled to qualified immunity.

## C.    Substantive Due Process

The purpose of the Fourteenth Amendment "was to protect the people from the State, not to ensure that the State protected them from each other."  *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195-96 (1989).  Therefore, "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id.* at 197.  When police officers "merely [stand] by and [do] nothing," or "[fail] to act upon reports of past violence" it does not implicate a plaintiff's due process rights.  *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993); *see also Harrington v. Cnty. of Suffolk*, 607 F.3d 31,

15

34 (2d Cir. 2010) ("[T]he benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations.") (quoting *Castle Rock*, 545 U.S. at 756).

Courts adhere to this circumspect approach because "[s]ubstantive due process is an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "Accordingly, the protections of substantive due process are limited to governmental action that is 'arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised.'" *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation marks and citations omitted). "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale*, 170 F.3d at 263.

When a plaintiff pleads facts establishing that state actors "in some way had assisted in creating or increasing the danger to the victim" his substantive due process claim may survive under the "state created danger" doctrine. *Dwares*, 985 F.2d at 99. Allegations that have cleared this high bar include police officers conspiring with a group of "skinheads" and agreeing "to permit the 'skinheads' to harass and assault [protestors] . . . so long as this conduct did not get totally out of control," *id.* at 96-97, and allegations that police officers gave a private citizen a gun that the private citizen then used to shoot a fleeing robbery suspect. *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998).

In its state created danger cases, the Second Circuit distinguishes between passive failure to stop private violence, which is not actionable, and affirmative conduct, which may form the basis for a due process claim. *Pena v. DePrisco*, 432 F.3d 98, 109-10 (2d Cir. 2005). "[A]ffirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence," *Okin*, 577 F.3d 415, 429 (2d Cir. 2009), and is of a nature that "may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at

112 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  The Second Circuit has discussed government conduct that implicitly sanctions private violence in two cases, which are instructive here.

In *Pena v. DePrisco*, the Second Circuit upheld claims asserted by family members of pedestrians who had been killed when a drunk off-duty police officer drove his car through multiple red lights.  432 F.3d 98 (2d Cir. 2005).  The *Pena* court agreed with the plaintiffs "that to the extent that fellow police officers and some supervisors participated in or condoned [the off-duty officer's] behavior" and, in the case of one supervisor-officer, "invited" the off-duty officer to drive after drinking, "it could be inferred by a reasonable juror that those defendants, by their actions, implicitly but affirmatively condoned" the misconduct and indicated to the off-duty officer "that he would not be disciplined for his conduct."  *Id.* at 111.  Consequently, the court held that when "state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others," those officials may be held liable for injury caused by the private party's misconduct.  *Pena*, 432 F.3d at 111.  But the *Pena* court emphasized that the claim it upheld was "based on more than a failure to prevent misbehavior and to reprimand or punish the miscreants," and "assert[ed] that prior assurances of impunity were *actually*, albeit implicitly, communicated."  *Id.* at 112 (emphasis added).

In *Okin v. Village of Cornwall-On-Hudson Police Department*, the Circuit held that defendant police officers implicitly encouraged domestic violence, "racheting up the threat of danger" to the plaintiff who had previously reported that she had been kicked, choked, and beaten.  577 F.3d at 430.  Ms. Okin alleged that when she first called the police department to report domestic violence the responding officers were "very derogatory" toward her, and to the extent that they spoke with Sears, her partner and alleged assailant, "it was about football."  *Id.* at 421.  Over the next fifteen months Okin called the police more than a dozen times, and the record before the court on

summary judgment "demonstrate[d] an escalating series of incidents that followed the officers'

response to Okin's first complaint of domestic violence, where the officers and Sears had discussed

sports, and the officers openly expressed camaraderie with Sears and contempt for Okin." *Id.* at

430.  The Second Circuit held that "the implied message of the officers' conduct may have

galvanized Sears to persist in violent encounters with Okin." *Id.*

      The instant case differs markedly from *Pena* and *Okin*.  The allegations of communication

between Defendants and Monroe are weak at best.  White argues that Defendants' actions—

smirking as Monroe harassed White the morning of May 6, refusing to take White's complaint and

failing to arrest Monroe for his conduct, and failing to respond to one 911 call after Monroe was

released from custody—communicated to Monroe that he would not be punished for harassing

White, and increased the danger to White.  The Court is not persuaded that White has adequately

alleged that Defendants communicated, even implicitly, that Monroe's harassment of White was

sanctioned.  "A failure to interfere when misconduct takes place, and no more, is not sufficient to

amount to a state *created* danger."  *Pena*, 432 F.3d at 111.  Defendants are not alleged to have

participated in or encouraged the misconduct, as the defendants in *Pena* did.  Nor did the

Defendants repeatedly ignore claims of escalating violence, as the officers did in *Okin*.  Defendants

here responded to the 911 call on May 6, 2015 by taking complaints from two individuals and

ultimately arresting Monroe, albeit not on the charges White wished to form the basis of the arrest.

The fact that Monroe was arrested on charges of domestic violence as opposed to other misconduct

does not support an inference that Defendants were implicitly communicating to Monroe that his

other misconduct would be overlooked, and White has not offered any facts whatsoever in support

of his conclusory assertion that his 911 call was ignored because he is a transgender man.

      But the Court need not rest its decision on the lack of communication between Officer

Garcia, Officer Ureiba, and Monroe, because even assuming that affirmative communication took

place, the alleged government conduct—refusing to take complaints or make an arrest based on

non-physical harassment—does not reach the high bar required to establish a constitutional claim. "[T]he protections of substantive due process are limited to governmental action that is 'arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised.'" *Lowrance*, 20 F.3d at 537. Monroe's conduct may have been bullying and bigoted, but the officers' decision not to arrest him for it or to respond to White's complaints with alacrity was not so outrageously arbitrary, conscience-shocking, or oppressive as to constitute a violation of White's constitutional rights.

Because White fails to allege conduct that shocks the conscience, his substantive due process claim is dismissed with prejudice. *See Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011) (affirming dismissal with prejudice of a substantive due process claim when plaintiff "failed to allege any behavior . . . that could reasonably be considered egregious, outrageous, or conscience-shocking."); *Dellutri*, 895 F. Supp. 2d at 574 (dismissing with prejudice a claim where "[t]he conduct alleged by Plaintiff simply does not rise to the level of being so outrageous as to violate Plaintiff's substantive due process right."); *Ruston v. Town Bd. for Town of Skaneateles*, No. 5:06-cv-927-FJS-GHL, 2008 WL 5423038 at *5 (N.D.N.Y. Dec. 24, 2008) (dismissing with prejudice a substantive due process claim where plaintiff failed "as a matter of law, to allege conduct that shocks the conscience.").

### D.  Municipal Liability

As discussed above, White has failed to state a substantive due process claim against any defendant, and Officers Garcia and Ureiba, and Lt. Cautter, are insulated from potential liability with respect to White's equal protection claim because they are entitled to qualified immunity. Unlike individual defendants, however, "municipalities have no immunity from damages for liability flowing from their constitutional violations," and so the Court must separately consider whether White has stated an equal protection claim against the City. *See Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2012) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012)). Assuming, *arguendo*, that

White's equal protection claim should be evaluated under intermediate scrutiny and that under that standard he could state a claim—an issue the Court need not and does not reach today—he still fails to state a claim for municipal liability under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

A municipality is not vicariously liable for its employees' actions under § 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 691). Municipalities are, however, liable for "their *own* illegal acts." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). Plaintiffs seeking to hold a municipality liable under § 1983 must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 425 (S.D.N.Y. 2013) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

A plaintiff may satisfy the first of those prongs in one of four ways: by alleging the existence of (1) a formal policy, (2) action taken or decisions made by policymakers that caused the violation of plaintiff's rights, (3) a practice so persistent and widespread that it constitutes a "custom or usage," or (4) a failure to properly train or supervise municipal employees. *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (citations omitted). White argues that he states claims under the third and fourth categories, but for the reasons below, these allegations are not supported by factual information that makes an inference of culpability plausible.

1. *White Does Not Allege a Persistent and Widespread Practice*

White alleges that "the City's official custom or policy with respect to the NYPD's treatment of persons of trans experience is to abuse them." AC ¶ 190. He does not claim that there is any

formal policy underlying this abuse, but instead claims that the abuse is so common that is may be considered a custom.  In support of this alleged policy White offers the following facts:[2]

- White alleges that three women of trans experience, Ms. Jennifer Louise Lopez, Ms. Rachel Burrous, and Ms. Shagasyia Diamond, have been mistreated by the NYPD in the past two years.  Specifically, NYPD officers refused to take Ms. Lopez's complaints regarding criminal harassment by her neighbors, NYPD officers arrested Ms. Burrous instead of her spouse after her spouse physically abused her, and NYPD officers arrested Ms. Diamond for domestic violence after being called to her residence in response to a noise complaint.  AC ¶¶ 192-95.

- White further relies on "acts of abuse that have been widely reporter in the media over the past decade," specifically a 2007 incident in which NYPD officers pepper-sprayed demonstrators at a celebration of the Sylvia Rivera Law Project (an organization that advocates for low-income people of color who are transgender); the 2011 arrest and detention that formed the basis of the complaint in *Adkins*; and a 2012 incident in which the NYPD chained a transgender woman to a fence for more than a day.  White also cites a 2015 New York Times article describing a forum in which transgender persons stated that they had been mistreated by the NYPD, but had not lodged formal complaints.  AC ¶¶ 196-97, 200.

- Finally, White cites two incidents of private violence against persons of trans experience that he alleges were not handled appropriately:  a 2013 incident in which three women of trans experience were severely beaten, one of them to death, but the perpetrator was not indicted until 2015, and a 2014 incident in which a woman of trans experience was beaten to the point of suffering a traumatic brain injury but no arrests were made.  AC ¶¶198-99.

The two instances in which transgender women were beaten by private citizens do not support plaintiff's claim that the City has a policy of abusing transgender individuals.  While White blames the delay in indictment or lack of arrests made in response to these incidents on a police

---

[2] The broader the policy a plaintiff seeks to plead, the greater the factual allegations that are required to render it plausible.

> When a plaintiff tries to fall within Monell by defining the alleged 'custom of policy' as broadly as plaintiffs have here, he takes an almost impossible burden upon himself.  It is one thing to assert, for example, that a municipality is training its officers to use a particular choke-hold that carries a high risk of asphyxiation not used by other municipalities, or that senior management is failing to train its officers to refrain from using that choke-hold even though they know officers are frequently using it.  It is quite another matter to allege broadly that as a general practice, a municipality fails to give 'adequate' remedial training for officers' violations of the full panoply of constitutional rights, for which the appropriate remedial action might vary infinitely with the distinct facts of any police encounter.

*Rasmussen v. City of New York*, 766 F. Supp. 2d, 399, 408 (E.D.N.Y. 2011).

force allegedly prejudiced against transgender individuals, there are a multitude of potential explanations for a delay in indictment or an inability to make an arrest.  White's conclusory assertions that the police were dilatory in performing their duties in the two incidents are unsupported by factual allegations.

With respect to the other allegations, White has collected six incidents and one newspaper article over the past decade in support of his allegation that NYPD has a policy of abusing people of trans experience.  These half dozen incidents describe a range of conduct from inappropriate pepper-spraying of protestors to allegedly unlawful arrests in response to incidents of domestic violence (the newspaper article reports unspecified "mistreatment"), but only one of the incidents has generated a lawsuit—that of Ms. Lopez, which is currently pending before Judge Buchwald—and none have resulted in an admission or finding of liability.  *See Walker v. City of New York*, No. 14-cv-808-ER, 2015 WL 4254026 at *8-9 (S.D.N.Y. July 14, 2015) (plaintiff who listed thirty-six separate lawsuits pending against the NYPD for allegedly falsely arresting people of color for drug-related offenses failed to state a widespread practice claim under *Monell* where none of the lawsuits resulted in admissions or findings of liability); *Tieman v. City of Newburgh*, No. 13-cv-4178-KMK, 2015 WL 1379652 at *17 (S.D.N.Y. Mar. 26, 2015) ("the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive as to constitute a custom"); *compare with Adkins*, 143 F. Supp. 3d at 142 (plaintiff who alleged eyewitness accounts and internal police documents showing the existence of "a *specific pattern* of misconduct, *viz.*, handcuffing transgender detainees to railings" stated a *Monell* claim) (emphasis added).

Half a dozen dissimilar incidents spread over the past five years fail, as a matter of law, to render the generalized, conclusory allegations of the existence of a policy of abuse towards transgender persons that White alleges plausible.

22

2. *White Does Not State a Claim for Failure to Train*

Finally, White invites the Court to conclude, based on the alleged "pervasive history" of animus against persons of trans experience and the fact that the City knows its officers will encounter persons of trans experience, that the City's failure to train NYPD officers must be at fault. The Court declines this invitation.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In order for municipal liability to attach under Section 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To allege deliberate indifference in the context of a failure-to-train claim, a plaintiff must plead facts giving rise to a plausible inference that (1) the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) either the situation presents the employees with a difficult choice of the sort that training will make less difficult, or there is a history of employees mishandling the situation, and (3) the wrong choice by the employee will frequently cause a constitutional deprivation. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

White's conclusory allegations regarding the City's alleged failure to train its police officers fail to state a claim. He states that "[a]dequate training regarding [issues peculiar to persons of trans experience] will make it substantially less likely that the rights of persons of trans experience will be violated." AC ¶¶ 206-07. But the facts in the Amended Complaint do not plead a pattern of similar constitutional violations, such that the City was on notice that different, or additional, training was needed. *See Pluma v. City of New York*, No. 13-cv-2017-LAP, 2015 WL 1623828, at *12 (S.D.N.Y. Mar. 31, 2015) (holding that a "handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations through their deployment of pepper

23

spray"); *see also Marom v. City of New York*, No. 15-cv-2017-PKC, 2016 WL 916424, at *22 (S.D.N.Y. Mar. 7, 2016) (holding that a study recommending further investigation of previously alleged incidents of force was insufficient to state a failure-to-train claim). "[W]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Moreover, merely claiming "that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. 68; *see also Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) ("A training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.") (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 27 (1st Cir. 2005)).

White has failed to establish a history of NYPD officers mishandling situations involving persons of trans experience such that the City was deliberately indifferent by failing to provide the unspecified training that he desires. Accordingly, because White has failed to allege either a widespread practice or a failure-to-train claim, his *Monell* claim is dismissed without prejudice.

### E. State Law Claims

Under 28 U.S.C. § 1367(c)(3), the exercise of supplemental jurisdiction over Plaintiff's remaining claims under the NYSHRL and NYCHRL is within the Court's discretion if it has "dismissed all claims over which it has original jurisdiction." The Second Circuit counsels against exercising supplemental jurisdiction in such a situation: "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as

well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed all of Plaintiff's claims that were based on a federal question under 28 U.S.C. § 1331, and there being no other basis for federal jurisdiction over this case, the Court declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3). Accordingly, those claims are dismissed without prejudice.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss, Dkt. 70, is GRANTED in its entirety.

SO ORDERED.

Dated:  September 11, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge